828 A.2d 869

ROBERT L. LOCKLEY, JR., PLAINTIFF–APPELLANT, v. STATE
OF NEW JERSEY, DEPARTMENT OF CORRECTIONS, DE-
FENDANT–RESPONDENT, AND POLICE BENEVOLENT AS-
SOCIATION, LOCAL 105, AND INDIVIDUALLY, AND IN THEIR
OFFICIAL CAPACITIES, COMMISSIONER WILLIAM H. FAU-
VER, RONDA TURNER AND JACQUELINE JONES, DEFEN-
DANTS.

Argued January 6, 2003—Decided August 11, 2003.

414

*Linda Wong* argued the cause for appellant (*Wong Fleming*, attorneys; *Ms. Wong* and *Daniel C. Fleming*, of counsel; *Ms. Wong, James K. Haney* and *Robert G. Feldman*, on the briefs).

*Patrick DeAlmeida*, Deputy Attorney General, argued the cause for respondent (*David Samson*, Attorney General of New Jersey, *Nancy Kaplen* and *Allison E. Accurso*, Assistant Attorneys General, of counsel).

*Jon W. Green* submitted a brief on behalf of amicus curiae, National Employment Lawyers Association of New Jersey (*Green, Lucas, Savits, & Marose,* attorneys).

The opinion of the Court was delivered by

PORITZ, C.J.

This Court has held that a plaintiff who seeks punitive damages based on an alleged violation of the Law Against Discrimination (LAD), *N.J.S.A.* 10:5–1 to –49, by a public or private entity must prove that upper level management acted in such manner as to warrant the imposition of those damages. This case presents two questions: whether the trial court's instructions (1) sufficiently informed the jury in respect of the upper level management determination, and (2) properly described the considerations relevant to the calculation of a punitive damages award against a public entity.

# I

## A

### *Facts*

Plaintiff Robert L. Lockley is employed as a Senior Corrections Officer by the Department of Corrections of the State of New Jersey (DOC) at the Mid–State Correctional Facility (Mid–State) in Wrightstown, New Jersey. Mid–State is a medium-security prison housing about 600 inmates, all of them male. Although the majority of the staff at Mid–State is also male, there are a small number of female officers, including defendants Ronda Turner and Jacqueline Jones.

This case arises primarily out of a series of interactions between Lockley and Turner that began in 1990. At that time, the two officers worked on the same shift at Mid–State, but in different areas of the prison, Lockley in a perimeter tower and Turner in Mid–State's "Center Control" room. In about 1988, Turner began

making flirtatious comments to Lockley who never indicated that he found those comments offensive. Beginning in 1990, however, Turner became more aggressive. She began to express an interest in having a sexual relationship with Lockley, an interest she communicated to him directly and also broadcast to fellow employees at Mid–State. Lockley rejected her overtures.

Eventually, Turner's comments to Lockley escalated to harassment and abuse. She and others spoke in graphic language about the inadequacies of his anatomy and used vulgar terms to describe his alleged sexual orientation and lack of sexual prowess. Turner also interfered repeatedly with Lockley's ability to perform his job by making him wait before she opened security gates for him and by refusing to record security-related phone calls that he made from the tower to Center Control. In 1992, when the situation intensified, Lockley reported Turner's conduct to his supervisors who responded by suggesting that he should agree to a sexual relationship with Turner.

In July 1993, Lockley filed a formal sexual harassment complaint with the DOC against Turner. Susie Belmont, who worked in the DOC's equal opportunity/affirmative action office, investigated Lockley's allegations and concluded that there was probable cause to believe that they had merit. Belmont prepared a probable cause letter, signed by William H. Fauver, the former Commissioner of the DOC, recommending that the matter immediately proceed to consideration of the appropriate discipline for Turner.

The DOC charged Turner with violations of the Civil Service laws and the corrections officers' collective bargaining agreement, including conduct unbecoming an employee, among other charges. Turner was assigned to a different shift against her wishes, where she remained for several months. When a position opened on Lockley's shift, however, Turner sought a transfer back. Although her application was initially denied, she later prevailed on a grievance claim under the collective bargaining agreement and was sent back to her prior shift based on her seniority. Turner's co-workers celebrated her return to the shift by holding a party.

Turner's disciplinary hearing was adjourned several times and did not take place until six months after the DOC issued its letter. At the hearing, Captain Powell Johnson, who was assigned to present the case on behalf of the DOC, failed to produce any witnesses to support the written probable cause finding and, as a result, the hearing officer dismissed all charges against Turner. Johnson later testified that he was instructed by his superiors to do no more in support of the charges against Turner than submit the probable cause letter. Others testified that Johnson was instructed to put on witnesses and present a proper case for the DOC. In any event, Johnson was later disciplined for his failure to put in live testimony.

After the dismissal of charges, Turner's friends held another public party to celebrate.

## B

### *Litigation History*

Lockley instituted this litigation in 1994, asserting claims of sexual harassment, unlawful retaliation, and aiding and abetting under the LAD, and common law claims of assault and battery, intentional infliction of emotional distress, intentional interference with contractual relations, and defamation. He sought compensatory and punitive damages and named as defendants the DOC; Commissioner Fauver; the Police Benevolent Association (PBA), Local 105; and Corrections Officers Ronda Turner and Jacqueline Jones. Prior to trial, Lockley entered into a settlement agreement with the PBA and the two female officers.

In May 1999, Lockley's LAD claims against the DOC and Commissioner Fauver were submitted and tried to a jury. Because plaintiff was seeking punitive damages, the trial court bifurcated the proceedings, deferring a determination of the damages amount, if any, to a separate proceeding. During the initial phase of the trial, those defendants' liability under the LAD and the question of compensatory damages were considered by the

jury. At the close of Lockley's case, however, defendants moved to dismiss both the claims against Fauver and the punitive damages claim against the DOC. The trial court denied the motion in respect of the LAD claims against the Commissioner, but dismissed the punitive damages claim against him, finding that Fauver was at most negligent. The punitive damages claim against the DOC, however, remained in the case. When the first trial concluded, the court dismissed Lockley's compensatory damages claim for lost overtime wages as unsupported by the evidence. Despite a lack of expert testimony regarding Lockley's alleged emotional distress, the trial court permitted this claim to go to the jury.

On May 28, 1999, the jury returned a verdict exonerating Fauver. It found that the DOC was responsible for sexual harassment and unlawful retaliation, awarded Lockley $750,000 in compensatory damages, and determined that he was entitled to punitive damages. That same afternoon the trial proceeded to the punitive damages phase. The court denied a request by the DOC for a ninety-minute recess to allow an Assistant Attorney General familiar with the State appropriations process to provide information concerning the DOC's budget and finances for use by the jury in deciding the amount of punitive damages to be awarded. In so doing, the trial judge stated that

> the only legal issue here is what instruction, if any, should be given to the jury with respect to the financial capacity of the State ... to pay punitive damages
>
> ....
>
> [T]here are probably many different ways this could be handled. I don't believe there's any case law on it. There's no statute on it. There's no rule on it, that I'm aware of. It's ... not a matter of constitutional dimensions.

Ultimately, the trial court prohibited testimony in respect of DOC's ability to pay punitive damages and gave the following instruction to the jury:

> In determining the amount of punitive damages, you must consider all of the circumstances in this case, including: the nature of the wrongdoing; the extent of the injury or harm inflicted by the wrongdoing; the intent of the party committing the wrongdoing; the financial condition or wealth of the defendant; ... the

defendant's ability to pay any award of punitive damages; [and] the effect the judgment will have on the defendant and others.

You may also consider any mitigating circumstances which you find may justify a reduction of the amount of damages, including any punishment the defendant has received or will receive from other sources for the same misconduct.

Finally, you should be sure that there is a reasonable relationship between the actual injury and the punitive damages.

Punitive damages, however, may be higher than, equal to or lower than the compensatory damages of $750,000, which you have already awarded.

. . .

With respect to the ability of the Defendant State of New Jersey to pay punitive damages, I will tell you this. The State of New Jersey as a governmental entity has the ability, theoretically, to pay any award, any amount of punitive damages that you might award.

Money that the State of New Jersey obtains is obtained by using its power of taxation, by ... user fees, [etc.]. Of course, there's a budget that ... not only raises money [but] sometimes ... expends less than it raises, [creating] a surplus. Sometimes it spends more than it has raised, [running] a deficit. So that's in broad terms how the State functions.

Any monies that the State is required to expend for whatever purpose it may be, may or may not affect taxes. [It is p]ure speculation as to whether any amount of money that the State has to pay would affect taxes, and you [may] not in your consideration of punitive damages ... focus at all [on] how the amount of your award might affect taxes or anything of that nature.

You should determine the punitive damages based solely on the criteria that I have given you without focusing on how this is going to affect the tax rate or anything one way or the other anything of that nature.

The State did not object to those instructions.

The jury returned a verdict of $3 million in punitive damages against the DOC. Thereafter, the DOC renewed its motion to dismiss the punitive damages claim and also moved for judgment notwithstanding the verdict or, alternatively, a new trial or remittitur of the damages awards. The trial court rejected those motions, concluding that the awards, although "high" and "surprising," did not shock the judicial conscience. In addition, the court awarded over $850,000 in attorney's fees and costs.

On appeal, the State argued that the amount of compensatory and punitive damages awarded to Lockley "was excessive [and] that there was error in submitting the question of punitive dam-

ages to the jury." The State also argued that the evidence presented at trial had not demonstrated the type of egregious conduct by upper management required by *Cavuoti v. New Jersey Transit Corporation* and *Baker v. National State Bank,* which were decided after the trial had concluded. *See Cavuoti, supra,* 161 *N.J.* 107, 113, 117–18, 735 *A.2d* 548, 553–54 (1999) (discussing *Lehmann v. Toys 'R' Us, Inc.,* 132 *N.J.* 587, 624–25, 626 *A.2d* 445, 464 (1993)); *Baker, supra,* 161 *N.J.* 220, 223, 736 *A.2d* at 463–64 (1999). Finally, the State asserted that under *Baker, supra,* 161 *N.J.* at 230–31, 736 *A.2d* at 467–68, and *BMW of North America, Inc. v. Gore,* 517 *U.S.* 559, 575, 116 *S.Ct.* 1589, 1598–99, 134 *L.Ed.2d* 809, 826 (1996), the punitive damages award of $3 million was "disproportionate to both the harm inflicted and the underlying conduct."

The Appellate Division upheld both the compensatory damages and counsel fees awards, but found that the "trial court's instructions to the jury on punitive damages [were] fatally flawed" and reversed the punitive damages verdict. *Lockley v. Turner,* 344 *N.J.Super.* 1, 18–19, 28–30, 779 *A.2d* 1092, 1101–02, 1108–09 (App.Div.2001). The case was remanded for further proceedings. *Id.* at 31, 779 *A.2d* at 1109–10. In the court's view, the trial judge's instructions were defective in two important ways. *Id.* at 18–26, 779 *A.2d* at 1101–07. First, the judge did not ask the jury to assess "the roles of [the] particular staff members [involved] and their resultant conduct" so that the jury then could determine whether the harassment and retaliation were perpetrated by upper management. *Id.* at 19, 779 *A.2d* at 1102. The panel believed that such an instruction was essential in light of *Cavuoti, supra,* wherein this Court reaffirmed *Lehmann, supra,* and held that "punitive damages for employment discrimination are only appropriate [when] there is ... 'actual participation in or willful indifference to the wrongful conduct on the part of upper management.'" *Id.* at 19, 779 *A.2d* at 1102 (quoting *Cavuoti, supra,* 161 *N.J.* at 113, 735 *A.2d* at 551 (citation and internal quotation omitted)). The Appellate Division found that nothing resembling the factors established by *Cavuoti* regarding the upper manage-

ment determination had been communicated to the jury. *Id.* at 20–21, 779 *A.*2d at 1102–04. The court also found significant the jury's exoneration of Commissioner Fauver, the only remaining named defendant who "would be considered 'upper management.'" *Id.* at 21, 779 *A.*2d at 1103–04. In view of the testimony concerning the DOC's hierarchical structure, and the testimony of DOC employees whose "responsibilities . . . varied widely, as did their responses to Lockley's complaints," the court concluded that the lack of guidance regarding upper management was reversible error. *Id.* at 19, 21, 779 *A.*2d at 1102, 1103–04.

In respect of the trial judge's instructions concerning the method for calculating a punitive damages award against the State, the Appellate Division found that they were equally defective. *Id.* at 19, 23, 779 *A.*2d at 1102, 1104–05. The court reasoned that "punitive damages against the State" cannot be computed "in the same manner as against a private individual or entity" because

> the State has no net worth[, has] no [year-end] bottom line . . . to which one could point as profit earned from wrongful actions, [and has] no assets purchased from funds wrongfully generated and held as capital to generate further profit.
>
> [*Id.* at 23, 779 *A.*2d at 1105.]

The panel was troubled by the trial court's "reference to the State's ability to incur a deficit" in light of constitutional provisions related to a balanced budget and the assumption of debt. *Id.* at 24, 779 *A.*2d at 1105 (citing *N.J. Const.* art. VIII, § II, par. 3). Because "[n]either the parties nor the trial judge . . . sufficiently appreciated th[e] complexity" of the "proper method to assess . . . punitive damages against" a governmental entity, *ibid.,* the court posed a series of questions, not meant to be exhaustive, that should be considered on remand if the jury concluded that the conduct of upper management required the imposition of punitive damages:

> 1) Should a distinction be drawn between the Department of Corrections and the State as a whole? At first blush, it is difficult to perceive why the State's activities in areas other than the Department of Corrections should be considered when setting the quantum of an award.
>
> 2) If the Department's budget is the proper measure, what are the relevant budget years?

3) If the Department's budget has increased significantly over that time frame, what are the causes for the increase? If the budget has increased because changes in the sentencing provisions of the criminal code increased the number of persons incarcerated, should [the] Department's exposure to a large punitive damages award be concomitantly increased or is an adjustment appropriate?

4) If the Department's budget is the appropriate measure, is the allocation made by the Department among different line items a relevant factor? For example, does the Department spend a sufficient amount on employee training and awareness? Or, on the other hand, would consideration of such a factor represent an unwarranted judicial intrusion into executive decision making?

5) Should the jury be told that the State cannot incur a deficit and that an award of punitive damages may have to be satisfied through adjustments to another budget line item?

[*Id.* at 24–25, 779 *A.*2d at 1105–06.]

Finally, the panel addressed case law from the United States Supreme Court and this Court establishing standards governing punitive damages awards in the context of private sector litigation. *Id.* at 26–27, 779 *A.*2d at 1106–07 (discussing *Cooper Indust., Inc. v. Leatherman Tool Group, Inc.*, 532 *U.S.* 424, 121 *S.Ct.* 1678, 149 *L.Ed.*2d 674 (2001); *BMW, supra,* 517 *U.S.* at 575, 116 *S.Ct.* at 1598, 134 *L.Ed.*2d at 826; *Baker, supra,* 161 *N.J.* at 231, 736 *A.*2d at 468). It explained that in *Baker, supra,* this Court incorporated the guidelines established in *BMW, supra,* along with the provisions of the Punitive Damages Act (PDA), *N.J.S.A.* 2A:15–5.9 to –5.17, "as the appropriate yardsticks for a LAD case to ensure that an award of punitive damages has a reasonable relationship to the injury inflicted." *Id.* at 26, 779 *A.*2d at 1107. Even though the award in this case had "not exceed[ed] the five-to-one ratio contained within the [PDA], *N.J.S.A.* 2A:15–5.14," the court found that it could not "save" an "irredeemably tainted" punitive damages verdict for the reasons previously expressed in its opinion. *Id.* at 27, 779 *A.*2d at 1108. The case therefore was sent back to the trial court for further proceedings related to the upper-level management and punitive damages issues. *Id.* at 31, 779 *A.*2d at 1109–10.

## II

We agree with the Appellate Division that the trial court's instructions were inadequate because no "attempt" was made "to

explain and expound upon the term 'upper management.' " *Id.* at 20, 779 *A.*2d at 1103. As in the private sector, public sector employers whose egregious conduct violates the LAD may be held " 'liable for punitive damages . . . only in the event of actual participation by upper management or willful indifference.' " *Cavuoti, supra,* 161 *N.J.* at 117, 735 *A.*2d at 554 (quoting *Lehmann, supra,* 132 *N.J.* at 625, 626 *A.*2d at 464). Upper management, however, is a class not readily discerned in every case. As we said in *Cavuoti,*

[a]t the margins, defining "upper management" is easy. A chief executive officer, chief operating officer, or a member of the board of directors satisfies the definition. At the other extreme, an assembly line worker or clerk with no supervisory responsibilities does not. Our task is to provide guidance for identifying "upper management" between those extremes.

[*Id.* at 122, 735 *A.*2d at 557.]

Toward that end, we suggested criteria that should be presented to juries when they are asked to consider whether certain individuals are part of an organization's upper management structure. *Id.* at 122–29, 735 *A.*2d at 557–61.

Specifically, we explained that defining upper management requires a fact-sensitive inquiry that depends not on labels or titles but on whether an employee possesses " 'significant power, discretion and influence . . . ,' capable of furthering the mission of the organization and of selecting courses of action from available alternatives." *Id.* at 123, 735 *A.*2d at 557 (quoting *New Jersey Tpk. Auth. v. Am. Fed'n of State, County and Mun. Employees, Council 73,* 150 *N.J.* 331, 356, 696 *A.*2d 585, 598 (1997)). To determine whether an employee possesses such authority, the fact-finder should be required to assess: " '(1) the relative position of [the] employee in [the] employer's hierarchy; (2) [the employee's] function and responsibilities; and (3) the extent of discretion [the employee] exercises.' " *Ibid.* Further, we added that

it is fair and reasonable to conclude that upper management would consist of those responsible to formulate the organization's anti-discrimination policies, provide compliance programs and insist on performance . . . , and those to whom the organization has delegated the responsibility to execute its policies in the workplace, who set the atmosphere or control the day-to-day operations of the unit (such as heads of departments, regional managers, or compliance officers). For an

employee on the second tier of management to be considered a member of "upper management," the employee should have either (1) broad supervisory powers over the involved employees, including the power to hire, fire, promote and discipline, or (2) the delegated responsibility to execute the employer's policies to ensure a safe, productive and discrimination-free workplace. Obviously such instructions should be tailored to the facts of the case and might be accompanied by special interrogatories when several officers are presented as members of "upper management."
[*Id.* at 128–29, 735 *A.*2d at 560–61.]

Although *Cavuoti* postdated this litigation by several months, the trial court's instructions in respect of upper management were not "tailor[ed] to the facts of [this] case," *id.* at 129, 735 *A.*2d at 561, and did not sufficiently apprise the jury of the scope of the inquiry in the punitive damages context. *Lockley, supra,* 344 *N.J.Super.* at 20–22, 779 *A.*2d at 1102–04. Rather, the trial court simply instructed the jury to consider "whether upper management had been involved" and gave no further guidance. *Id.* at 20, 779 *A.*2d at 1102.

As did the Appellate Division, we find that omission fatal. Indeed, a fact-specific inquiry reveals that there is an additional overlay on the upper management decision in light of "consistent testimony" that the DOC operated through a rigidly hierarchical, almost " 'paramilitary' " structure. *Id.* at 22, 779 *A.*2d at 1104. The State contended below that Lockley's tormentors were "lower level employees" within this hierarchy, and that "higher level staff" appropriately attempted but were ultimately frustrated in their efforts to deal with the situation. *Id.* at 19, 779 *A.*2d at 1102. By contrast, "Lockley ... argued that the [DOC] made no meaningful effort to provide relief to him[,]" delayed its investigation and the hearing, and impeded efforts to "assign Turner to another facility." *Ibid.* In support, he "presented the testimony of eighteen present or former [DOC] employees," including Commissioner Fauver, each of whom had different responsibilities and responded in different ways to Lockley's allegations of harassment. *Id.* at 21, 779 *A.*2d at 1103–04. It is unlikely that every employee within the DOC command structure had the authority to take remedial action in this case; it is also unlikely that, without instruction from the trial court, the jury examined the duties,

responsibilities, and powers of each of the DOC employees whose conduct or willful indifference affected Lockley to determine whether they were part of the DOC's upper management. Only on such a finding could the jury properly have awarded punitive damages against the DOC. *See Hurley v. Atlantic City Police Dep't,* 174 *F.*3d 95, 124 (3d Cir.1999) (applying *Cavuoti* and holding that trial judge's failure to properly instruct jury regarding upper management requirement constituted reversible error), *cert. denied,* 528 *U.S.* 1074, 120 *S.Ct.* 786, 145 *L.Ed.*2d 663 (2000).

In these circumstances, we hold that the award of punitive damages against the DOC cannot stand and remand this matter for retrial in respect of the conduct of upper management within the framework established in *Cavuoti, supra.*

## III

We turn now to the second issue presented herein: the standards by which punitive damages should be calculated and assessed in a LAD case involving a public entity defendant.

## A

### *Punitive Damages Against Private Sector Defendants*

In 1993, Justice Pollock observed that "[i]n recent years courts, legislatures, and scholars have resumed the long-standing debate on the legitimacy of punitive-damage[s] awards." *Herman v. Sunshine Chemical Specialties, Inc.,* 133 *N.J.* 329, 337, 627 *A.*2d 1081, 1085 (1993). Because of that debate, in *Sunshine Chemical, supra,* the Court attempted to place limits on such awards by establishing reasonable and practical guidelines for the assessment of appropriate monetary damages. *Id.* at 338, 627 *A.*2d at 1085.

*Sunshine Chemical* was a products liability action, but the Court's concern about the "legitimacy of punitive-damages awards" was broad. *Id.* at 337, 627 *A.*2d at 1085. Justice Pollock described the problem:

We have proceeded with an appreciation that at the core of punitive damages lurks a volatile dilemma: the same findings necessary for the award of punitive damages can incite a jury to act irrationally. A condition precedent to a punitive-damages award is the finding that the defendant is guilty of actual malice. The purposes of the award—the deterrence of egregious misconduct and the punishment of the offender—when mixed with a finding that the defendant is malicious, can readily inflame an otherwise-dispassionate jury. Essential to a fair and reasonable award therefore is the consideration of all relevant circumstances, including the nature of the defendant's misconduct and the harm to the plaintiff. Stated generally, the award of punitive damages "must bear some reasonable relation to the injury inflicted and the cause of the injury."

[*Id.* at 337–38, 627 *A.*2d at 1085–86 (citations omitted).]

Drawing on factors described in *Fischer v. Johns–Manville Corp.*, 103 *N.J.* 643, 512 *A.*2d 466 (1986), the Court held that,

■n addition to bearing a reasonable relationship to [the] actual injury, the amount of punitive damages should account for the profitability of the defendant's ... misconduct, the plaintiff's litigation expenses, the punishment the defendant will probably receive from other sources, the defendant's financial condition, and the effect on its condition of a judgment for the plaintiff.

[*Id.* at 338–39, 627 *A.*2d at 1085–86 (citing *Fischer, supra,* 103 *N.J.* at 673, 512 *A.*2d at 482).]

■ Two years later, the New Jersey Legislature enacted the PDA. By that statute, the Legislature stepped into the fray and established the calculus to be employed in the assessment of a punitive damage award:

If the trier of fact determines that punitive damages should be awarded, the trier of fact shall then determine the amount of those damages. In making that determination, the trier of fact shall consider all relevant evidence, including, but not limited to, the following:

(1) All relevant evidence relating to the factors [used to determine whether punitive damages are to be awarded];

(2) The profitability of the misconduct to the defendant;

(3) When the misconduct was terminated; and

(4) The financial condition of the defendant.

[*N.J.S.A.* 2A:15–5.12c.]

The determinative factors referenced in subsection (1) "includ[e] but [are] not limited to the following:"

(1) The likelihood, at the relevant time, that serious harm would arise from the defendant's conduct;

(2) The defendant's awareness o[r] reckless disregard of the likelihood that the serious harm at issue would arise from the defendant's conduct;

(3) The conduct of the defendant upon learning that its initial conduct would likely cause harm; and

(4) The duration of the conduct or any concealment of it by the defendant.

[*N.J.S.A.* 2A:15–5.12b.]

The PDA also sets a cap on the amount that may be assessed against a defendant of "five times the liability of that defendant for compensatory damages or $350,000, whichever is greater." *N.J.S.A.* 2A:15–5.14b. Although LAD actions specifically are excluded from the statutory cap, *N.J.S.A.* 2A:15–5.14c, "its general requirements for procedural and substantive fairness are mandat[ory]" in future LAD cases. *Baker, supra,* 161 *N.J.* at 229, 736 *A.*2d at 467.

In 1999, contemporaneously with *Cavuoti, supra,* this Court decided *Baker, supra. Baker* involved a claim under the LAD in which punitive damages were sought against a private entity for age and sex discrimination. 161 *N.J.* at 224, 736 *A.*2d at 464. After trial, the plaintiffs decided that they would share equally in a $4 million punitive damages award against the defendant that far exceeded the amount of compensatory damages. *Id.* at 225, 736 *A.*2d at 464–65. In reversing and remanding on the question of punitive damages, the Court held that the trial court had not sufficiently considered the requirements of the PDA when it permitted the $4 million award. *Id.* at 229, 231–32, 736 *A.*2d at 467, 468–69. Although the PDA had been enacted after the commencement of the action in *Baker, supra,* (as in this case), we found that the statute was relevant in addressing "the disparity between the harm suffered by plaintiffs and the amount of the award." *Id.* at 231, 736 *A.*2d at 468. We opined that the "policy judgment [underlying] the statute [was] sound," and that reviewing courts may, but are not required to, use the ratio provision of the Act "as a normative measure of the limits of proportion." *Id.* at 229, 231, 736 *A.*2d at 467, 468.

*Baker* recognized that the determination of a punitive damages award against a private entity is bound by "substantive constitutional limits," *id.* at 229, 736 *A.*2d at 467, defined by the United States Supreme Court in *BMW, supra,* 517 *U.S.* at 575,

116 *S.Ct.* at 1598. Although the *BMW* standards derive from Fourteenth Amendment due process considerations that apply to private and not public entities, they serve a limiting function that is relevant to our analysis. They include

> "the degree of reprehensibility of the conduct that formed the basis of the civil suit; the disparity between the harm or potential harm suffered by the injured party who was the plaintiff in the civil case and the plaintiff's punitive damages award; and the difference between this remedy and the civil penalties authorized or imposed in comparable cases."
>
> [*Id.* at 230, 736 *A.*2d at 467 (quoting *BMW, supra,* 517 *U.S.* at 575, 116 *S.Ct.* at 1598–99, 134 *L.Ed.*2d at 826).]

In combination with the criteria set forth in the PDA, the *BMW* standards are designed "to ensure that any award of punitive damages bears 'some reasonable relation' to the injury inflicted." *Id.* at 229, 231, 736 *A.*2d at 467, 468.

## B

### *Punitive Damages Against Public Sector Defendants*

In *Gares v. Willingboro Township,* 90 *F.*3d 720 (1996), the Third Circuit Court of Appeals considered whether a female employee of a municipal police department was entitled to the $30,000 in punitive damages she recovered in a sexual harassment action against Willingboro Township. *Id.* at 722. Anticipating our decision in *Cavuoti, supra,* the court held that a public entity could be liable for punitive damages under the LAD. *Id.* at 725–30. In so ruling, the court predicted that we eventually would apply the general rule of *Sunshine Chemical, supra,* to LAD actions involving public entities. *Id.* at 730–31. The court concluded that requiring the plaintiff "to produce evidence of the defendant's ability to pay" a punitive damages award is an appropriate means of gauging whether an award is "large enough" to accomplish its deterrent effect, but not so large as to produce "unduly harsh consequences." *Id.* at 731. Despite "plaintiff's failure to produce evidence of defendant's ability to pay," the court sustained the punitive damages award, finding that "the jury reasonably [could] infer [from the trial testimony detailing the size of the police

department workforce] that, if the [municipality] could pay normal wages to hundreds of employees, it had the ability to pay $30,000 to one employee." *Id.* at 731–32.

In an attempt to provide direction to the trial court on remand, the Appellate Division in this case imported into the public sector punitive damages analysis questions relevant to the financial condition of a private sector defendant as found in the case law and the PDA. *Lockley, supra,* 344 *N.J.Super.* at 24–25, 779 *A.*2d at 1105–06. Cognizant of the differences between the financing of governmental operations and a private corporation, and of the complexities associated with the state appropriation process and the allocation of monies among state entities, the Appellate Division tried to find some reasonable approach to the calculation of damages against the State. In our view, that approach does not recognize the incentive structures that characterize public entities. Applying such traditional criteria as the defendant's financial profile in a given year, or the pecuniary impact of defendant's conduct on the "corporate bottom line," is simply unworkable when the defendant's financial status is governed by appropriations acts and tax levies rather than market forces.

We hold today that in an assessment of punitive damages against a public entity the financial condition of the defendant is not useful. We do so mindful of the purposes underlying punitive damages awards: "to punish . . . tortfeasor[s] and to deter [them] and others from similar conduct." *Abbamont v. Piscataway Bd. of Educ.,* 138 *N.J.* 405, 429, 650 *A.*2d 958, 970 (1994) (*Abbamont I*) (citing *Restatement (Second) of Torts* § 908 (1979); W. Prosser, *Law of Torts* 9–10 (4th ed.1971); 22 *Am.Jur.*2d Damages, § 739 (1988); 25 *C.J.S.* Damages § 117(1) (1966)), *appeal after remand,* 314 *N.J.Super.* 293, 714 *A.*2d 958 (App.Div.1998), *aff'd,* 163 *N.J.* 14, 746 *A.*2d 997 (1999) (*Abbamont II*). Yet, when an upper management public sector employee has acted egregiously, *Lehmann, supra,* 132 *N.J.* at 624–25, 626 *A.*2d at 464–65 (citing *Leimgruber v. Claridge Assocs.,* 73 *N.J.* 450, 454, 375 *A.*2d 652, 654 (1977)), and a jury has determined that punitive damages

should be assessed, consideration of the State's ability to pay does not further the goal of deterrence as it does in the private sector. Indeed, concepts of wealth and ability to pay are irrelevant in connection with public entities because public entities do not create their own wealth and are not driven by a profit motive.[1] The State cannot be deterred by an award based on its "bottom line" because it does not have one in the private sector sense.

Those considerations do not suggest, however, that the deterrent effect is absent in actions against a public entity. We expect that public officials will be motivated to avoid misconduct that exposes the State to financial sanction in the form of punitive damages if only because of the stigma attached to that judgment. To the extent that public officials so conform their behavior, the potential for punitive damages exerts a salutary effect on government actors at the highest level. As we stated in a related but somewhat different context, "punitive damages ... constitute a stringent corrective and potent deterrent against egregious wrongdoing by upper-level supervisory government officials." *Abbamont I, supra,* 138 *N.J.* at 429, 650 *A.*2d at 970.

Although we conclude that punitive damages have a deterrent effect, we share the view that "the award of punitive damages cannot be left to the unguided discretion of the jury" in public sector cases. *Bain v. City of Springfield,* 424 *Mass.* 758, 678 *N.E.*2d 155, 162 (1997). Therefore, to ensure that punitive damages against public entities do not exceed the bounds of reason, we also conclude that the standards applied in private sector cases, with the exception of those relating to the financial condition of

---

[1] Independent public corporate entities that generate revenues, such as the New Jersey Transit Corporation (NJT), *N.J.S.A.* 27:25-4, and the New Jersey Sports and Exposition Authority (NJSEA), *N.J.S.A.* 5:10-4, are confined by their enabling legislation to certain public purposes in their use of those revenues. *See, e.g., N.J.S.A.* 27:25-4, -5 (enumerating powers of NJT to provide public transportation services); *N.J.S.A.* 5:10-6 (enumerating powers of NJSEA to provide sports projects and establishing an order of priority for disposition of revenues).

the defendant, should be used to guide the jury in its computation and to assist the court in its review of a punitive damages award. We observe that the PDA requires clear and convincing evidence of egregious conduct and is applicable to all cases filed on or after October 27, 1995. *L.* 1995, *c.* 142, § 11.

In sum, those provisions of the PDA, *N.J.S.A.* 2A:15–5.12b, that set forth the standards to be used in determining whether punitive damages are warranted in the first instance, and those standards that govern the calculation of the amount of such an award, *N.J.S.A.* 2A:15–5.12c, with the exception previously noted, provide sufficient guidance in cases involving public sector defendants.[2] We emphasize further the trial courts' important role as set out in the PDA, which states:

> Before entering judgment for an award of punitive damages, the trial judge shall ascertain that the award is reasonable in its amount and justified in the circumstances of the case, in light of the purpose to punish the defendant and to deter that defendant from repeating such conduct. If necessary to satisfy the requirements of this section, the judge may reduce the amount of or eliminate the award of punitive damages.

[*N.J.S.A.* 2A:15–5.14a.]

The judge should also consider the award in light of the civil penalties authorized by the statute or imposed in comparable cases. We point out that the LAD includes a schedule of penalties to be assessed "in addition to any other relief or affirmative action provided by law," *N.J.S.A.* 10:5–14.1a, that ranges in value from $10,000 to $50,000, depending upon the frequency of the offense within specified time frames, *N.J.S.A.* 10:5–14.1a(a) to (c).

Finally, reviewing courts should consider the reasonableness of any award of punitive damages against a public entity

---

[2] Model Jury Charge 6.20B describes the factors found in the PDA and found relevant by this Court in *Baker, supra,* to guide the computation of punitive damages. By this opinion, we refer to the Supreme Court Committee on Model Jury Charges (Civil) consideration of any revisions to the model charge in respect of cases involving public entity defendants. Certainly, the trial court should not instruct the jury regarding the State's ability to pay, or any other factor relating to profit, etc.

within the constitutional framework embraced by this Court in *Baker, supra.* Consistent with our holding in that case, and as stated above,

> courts reviewing punitive damages awards should apply both the requirements of the PDA (with the exception of the statutory cap) and the substantive standards of *BMW v. Gore* in order to ensure that any award of punitive damages bears "some reasonable relation" to the injury inflicted.

> [*Baker, supra,* 161 *N.J.* at 231, 736 *A.*2d at 468.]

As the Supreme Judicial Court of Massachusetts has cogently observed,

> [t]he same considerations that require scrutiny and control by the trial judge or a reviewing court to meet the requirements of due process apply here even though no constitutional due process rights are implicated.

> [*Bain, supra,* 678 *N.E.*2d at 162–63 (citations omitted).]

Indeed, the court's responsibility to review awards of punitive damages for reasonableness is heightened when such damages are awarded against a public entity. The judge in the ordinary case acts as a check on the jury's calculation of punitive damages; in the case of a governmental entity, when public monies are the source of the award, the judge must scrutinize with great care the amount of the award to determine whether it is proportionate to the harm suffered by the plaintiff.

## IV

This matter is remanded to the Law Division for further proceedings consistent with this opinion. The judgment of the Appellate Division is modified and affirmed.

VERNIERO, LaVECCHIA, and ALBIN, JJ., concurring.

We concur in the Courts affirmance of the Appellate Divisions holding that the punitive award cannot stand in this matter due to the trial courts failure to charge the jury properly on upper management. So long as punitive damages are available against public entities, we cannot say that there is a better standard than the one proposed by the Court. This case illustrates the difficulty—and perhaps the impossibility—of fashioning jury instructions

that will allow the rational assessment of punitive damages against a public entity.

Had the issue squarely been raised, we would have been inclined to address a more fundamental question—whether *Cavuoti v. New Jersey Transit Corp.*, 161 *N.J.* 107, 735 *A.*2d 548 (1999), erroneously interpreted the New Jersey Law Against Discrimination, *N.J.S.A.* 10:5–1 to –49(LAD), to permit punitive damages to be assessed against public entities. Today, in *Green v. Jersey City Board of Education*, 177 *N.J.* 434, 445, 828 *A.*2d 869, 890 (2003), the Court has construed the Conscientious Employee Protection Act, *N.J.S.A.* 34:19–1 to –9 (CEPA), to allow an award of punitive damages against a public entity. We respectfully dissented in *Green.* The judicial debate over the proper interpretation of the CEPA and LAD in respect of the availability of punitive damages against public entities has come to an end. If the Court has misconstrued those statutes, as we believe it has, the Legislature is not without a remedy to correct the mistake.

*For modification and affirmance*—Chief Justice PORTIZ, and Justices COLEMAN, LONG, VERNIERO, LaVECCHIA and ALBIN—6.

*Opposed*—None.