NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-1414-21

SHELLEY PRITCHETT,

      Plaintiff-Respondent,

v.

STATE OF NEW JERSEY,

      Defendant-Appellant.

> **APPROVED FOR PUBLICATION**
>
> **January 30, 2024**
>
> **APPELLATE DIVISION**

Argued October 18, 2023 – Decided January 30, 2024

Before Judges Currier, Susswein and Vanek.

On appeal from the Superior Court of New Jersey, Law Division, Mercer County, Docket No. L-2189-13.

Peter G. Verniero argued the cause for appellant (Sills Cummis & Gross, PC, attorneys; Peter G. Verniero and Michael S. Carucci, of counsel and on the briefs).

Deborah Lynn Mains argued the cause for respondent (Costello & Mains, LLC, attorneys; Deborah Lynn Mains and Miriam S. Edelstein, on the brief).

The opinion of the court was delivered by

CURRIER, P.J.A.D.

This case, arising out of a failure to accommodate and discrimination action under the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-

1 to -50, returns to us after remand. A jury returned a verdict for plaintiff awarding her compensatory damages and $10 million in punitive damages. On appeal, we affirmed the finding of liability and the compensatory damage award but remanded for further proceedings on the amount of punitive damages, and specifically, for substantial consideration of the factors discussed by our Supreme Court in Baker v. National State Bank, 161 N.J. 220 (1999), and the United States Supreme Court in BMW of North America, Inc. v. Gore, 517 U.S. 559 (1996). Pritchett v. State, No. A-1956-17 (App. Div. Apr. 24, 2020) (slip op. at 1-2, 79-84), modified and aff'd, 248 N.J. 85 (2021).

Our Supreme Court granted defendant's petition for certification and modified this court's remand instructions. The Court held that when reviewing a punitive damages award against a public entity, a trial court must not only consider the Baker/BMW factors, but also needs to apply heightened scrutiny as required under Lockley v. State, Department of Corrections, 177 N.J. 413 (2003). Pritchett v. State (Pritchett I), 248 N.J. 85, 88 (2021).

Following remand from the Supreme Court, the trial court considered the parties' briefs and oral arguments and determined the punitive damages verdict was "reasonable" and "comport[ed] with due process" even when examined with "heightened scrutiny." In employing a de novo review and applying heightened

scrutiny to the BMW/Baker factors, we conclude the amount of the punitive

damages award was not unreasonable.  We affirm.

I.

The facts were thoroughly detailed in our prior opinion and Pritchett I.

For the reader's ease and context for our decision, we reproduce the facts set

forth in Pritchett I.

> Pritchett was hired by the Juvenile Justice Center (JJC) in 2006.  The JJC runs the state's juvenile correctional facilities and has approximately 400 employees at any given time.  Pritchett worked as a corrections officer in a JJC facility, and, by 2011, she held the title of Senior Corrections Officer [(SCO)]. Her duties included the responsibility to intervene when violence broke out among inmates.
>
> On June 8, 2011, Pritchett broke up a fight between two inmates.  As a result, she suffered injuries to her back, knee, and neck, went on Workers' Compensation leave, and sought medical assistance.
>
> In the fall of that year, Pritchett's physician noticed that an MRI of Pritchett's spine revealed abnormalities unrelated to her workplace injuries. Because of those abnormalities and Pritchett's physical complaints, her physician suspected that Pritchett was suffering from the early stages of multiple sclerosis (MS).  In a note dated September 17, 2011, her physician wrote that Pritchett had recovered from her workplace injuries and could return to work with no restrictions on their account, but the doctor recommended that Pritchett ask for additional leave time to seek a diagnosis and treatment for her underlying health issues and referred her to a neurologist.

Consistent with the physician's recommendation, Pritchett submitted a request for unpaid leave from her JJC position. Two days later, human resources (HR) officers forwarded the request to the Acting Director of the JJC, Captain Kelly Gibson, and to Pritchett's direct supervisor, Lisa Quinto. An internal email to Gibson indicates that HR had planned to approve the request; however, Captain Gibson was against it. HR then turned for support to Quinto, who, on September 27, emailed Gibson, telling him that Pritchett's "diagnosis is rather serious." She went on, "[y]ou may wish to consider approving this leave through November 1, 2011. This way we can write to her now and advise her no further leave will be approved beyond November 1 and if she is not medically cleared to return to work, she must resign." Quinto explained to Captain Gibson,

> If you determine she must return to work now, based on the medical, there will be no way she can return and we really have not given her warning that management will not approve further leave beyond a request to extend. If she cannot return in November and does not resign, you will have a stronger case to take steps to remove her and be more readily able to defend the removal in an appeal setting. Since [it's] only one plus month, we can give her fair warning she must return and then if she does not, you stand a much better chance of winning an appeal.

Nonetheless, Captain Gibson remained committed to denying Pritchett's request. HR then sought out the JJC's Deputy Executive Director for Operations, Felix Mickens, forwarding him Quinto's exchange with Gibson and adding that

> [t]o deny leave at this point will surely result in a removal (she has a very serious

A-1414-21

4

diagnosis) which will be appealed and not upheld. She will not be able to return to work (she incurred a work-related injury which resulted in the discovery of an unrelated personal medical condition) and we have not advised her management will not approve further leave. With removals we have established a winning defense . . . .

November is right around the corner—management should approve leave through this date as the medical states—we will write to her and say no further leave—if she does not, or cannot return, she can resign [or] we can initiate removal for failure to return from an approved leave of absence.

Pritchett's request was ultimately approved on October 11, granting her unpaid leave through November 1, 2011, but the approval came with the caveat that no further requests would be granted. She was informed that if she did not return to work on November 2, she would be expected to resign.

On October 19, Pritchett was diagnosed with MS. She requested additional leave time through February 29, 2012, with an expected return-to-work date of March 1. Gibson and Quinto both denied the request in internal emails. Upon receiving word of the denial, Pritchett telephoned Quinto, who would not provide an explanation as to why the JJC denied Pritchett's request. Instead, she told Pritchett that the JJC was not obligated to give her a reason, and then declined to put the denial in writing.

When November 1 came, Pritchett wrote to the JJC's HR manager, stating that she was not able to return to work, but that she did not want to resign.

A-1414-21

5

Mickens answered the letter through Pritchett's union representative, telling her that Pritchett would be subject to disciplinary proceedings—which would result in her termination without a pension—if she did not resign by the end of the week. Pritchett submitted an application for retirement disability benefits on November 4.

Thereafter, on November 21, Pritchett's union representative contacted the JJC's Americans with Disabilities Act (ADA) coordinator, informing the coordinator that Pritchett believed she was forced into retirement against her will. The coordinator answered that since Pritchett had already resigned, it was too late to engage in the ADA's interactive process and advised Pritchett to contact the JJC's Equal Opportunity Office. When it responded to Pritchett's request for reinstatement, that Office expressed its opinion that the JJC "failed to engage in the interactive process . . . . This failure to engage in the interactive process resulted in a violation of the State Anti-Discrimination Policy." However, the Office agreed with the ADA coordinator that Pritchett's "request for reinstatement [was] mooted by [her] approval for disability retirement."

. . . .

In October 2013, Pritchett filed a complaint against the State of New Jersey and unnamed John Does, alleging that the State violated the LAD by failing to accommodate her disability and discriminating based on the perception of disability. Following the State's unsuccessful attempts to end the matter through motion practice, the trial court conducted a jury trial in June 2017.

The trial resulted in the jury's return of a liability verdict in favor of Pritchett. The jury awarded compensatory damages totaling $1,824,911, which consisted of $575,000 for emotional distress; $343,789

in back pay; $472,639 in front pay; and $433,483 in future pension benefits.

The next day, the court reconvened the jury for a proceeding on punitive damages, during which the parties presented no new evidence. The jury's deliberations were brief, lasting from shortly after 2:00 p.m. until about 3:00 p.m.

The jury awarded Pritchett $10 million in punitive damages. All totaled, the trial court entered a judgment of $12,015,384.44 for Pritchett. That amount encompassed $78,367.65 in pre-judgment interest; $22,235.79 in costs; $11,824,911 in compensatory and punitive damages; and $89,870 in attorneys' fees.

[Pritchett I, 248 N.J. at 89-92 (alterations in original).]

We include additional facts elicited during trial that are important to our analysis of the issue on appeal. On November 1, 2013, the JJC revised its Leave of Absence policy to state that leaves would be subject to the approval of management and possible reasonable accommodation through the ADA coordinator. During the trial, Dr. Mark Lazar, an expert in neurology and MS, testified that plaintiff was "stable," "completely normal," and able to return to her SCO job without any restrictions.

Mickens testified that plaintiff was always welcome to return to her position as an SCO, if she received medical clearance. On the July 27, 2012 separation form, Gibson recommended plaintiff for reemployment with the JJC.

At the time of trial in June 2017, plaintiff was working two jobs, one at a Home Depot and another working with children in the foster care system.

## II.

As stated, we affirmed the jury's verdict on liability and its award of compensatory damages. We remanded for the trial court to review the punitive damages award applying the Baker/BMW factors. The Supreme Court's review of the matter was limited solely to "the standards to be applied by a trial court when reviewing a jury award of punitive damages against a public-sector defendant." Pritchett I, 248 N.J. at 96.

On November 30, 2021, the trial court issued an oral decision, concluding "the $10 million punitive damages award is reasonable and consistent with due process even when viewed under . . . the Lockley/Green[1] heightened scrutiny." The trial court discussed the Supreme Court's remand instructions to "apply a heightened scrutiny analysis to" the Baker/BMW factors, that is, (1) "the degree of reprehensibility of" defendant's conduct; (2) "the disparity between the harm or potential harm suffered by . . . plaintiff . . . and the . . . punitive damages award"; and (3) "the difference between th[e punitive damages award] and the civil penalties authorized or imposed in comparable cases." Baker, 161 N.J. at 220 (quoting BMW, 517 U.S. at 575).

---

[1]  Green v. Jersey City Bd. of Educ., 177 N.J. 434 (2003).

As for the first factor, the trial court noted we had "affirmed the jury's findings that the defendant's conduct, specifically that of Mickens, Gibson, and Bell was especially egregious and that this was shown by clear and convincing evidence"; therefore, whether there was sufficient evidence to support punitive damages had "already been determined in plaintiff's favor." The question then, according to the trial court, was "not whether there was especially egregious conduct . . . but how especially egregious was the conduct." The court concluded "based on the evidence considered by the jury . . . the degree of reprehensibility of the defendant's conduct was high" because "as the jury concluded, defendant forced a compromised law enforcement official who was unable to safely perform her job duties to resign or retire and, unlike plaintiff, other [corrections officers] had been granted leave in excess of the FMLA[2] time." The court also emphasized that "[t]he defenses raised by defendant were all rejected by the jury."

As for the second factor, the court referred to its findings regarding the first factor, concluding: "the degree of reprehensibility is high and the harm of discrimination suffered by Pritchett is certainly in line with the punitive damages awarded."

---

[2] Family and Medical Leave Act of 1993, 29 U.S.C. §§ 2601-2654.

In addressing the third factor, the court recognized that the "difference" between this remedy and the maximum civil penalty of $50,000" is a "significant difference." Nevertheless, the court found this factor was "not significant in light of the great weight given to factors one and two," which "weigh heavily in plaintiff's favor." The court reasoned:

> The parties in their briefs and oral argument go through various ratios for the [c]ourt to consider. No matter what ratio is considered, it is a single digit and does not offend due process even when viewed through Lockley's heightened standard. Nonetheless, including attorneys' fees and emotional distress damages which this [c]ourt concludes is the proper way to consider the ratio analysis, then the entire judgment would be just over $2 million and puts the ratio just below five. Even excluding emotional distress and attorneys' fees only moves the ratio to 7.4, also a number that is reasonable and satisfies due process using the heightened standard based on the high degree of reprehensible conduct of the defendant[] and harm of discrimination.

Therefore, the court concluded that its analysis of the factors required a determination that the punitive damages award in this case was "reasonable" and "comport[ed] with due process" even when examined under "heightened scrutiny." The court stated:

> [I]t is clear that the jury did not render its award based on passion, confusion, bias judgment or bias prejudice, or was inflamed in any way. As I stated in the post-judgment motions, this jury was intelligent, one that took notes, was deliberative, impartial and dispassionate and rendered an award consistent with the reprehensible conduct and harm to the plaintiff.

> In all the rigorous analysis and heightened scrutiny and due process analysis, we can't lose sight of the jury's reasoned judgment. But, as I said, their reasoned judgment does, in fact, comport with due process and is reasonable under the heightened review.

The court executed an order the same day memorializing its oral decision.

## III.

On appeal, defendant asserts the $10 million punitive damages award violates due process because the trial court did not apply the "heightened scrutiny" standard in reviewing the reasonableness of the award and did not consider whether the award served as a deterrent for future misconduct, a punishment for the bad behavior, and its proportionality to the bad behavior. Defendant also raises arguments regarding the appropriate standard this court should use in its review of a punitive damages award imposed against a public entity.

The purpose of punitive damages is "the deterrence of egregious misconduct and the punishment of the offender." Herman v. Sunshine Chem. Specialties, Inc., 133 N.J. 329, 337 (1993) (citing Leimgruber v. Claridge Assocs., 73 N.J. 450, 454 (1977)). The New Jersey Punitive Damages Act (PDA), N.J.S.A. 2A:15-5.9 to -5.17, permits recovery of punitive damages

> only if the plaintiff proves, by clear and convincing evidence, that the harm suffered was the result of the defendant's acts or omissions, and such acts or

> omissions were actuated by actual malice or
> accompanied by a wanton and willful disregard of
> persons who foreseeably might be harmed by those acts
> or omissions.
>
> [N.J.S.A. 2A:15-5.12(a).]

However, punitive damages may only be awarded if compensatory damages were awarded in the first stage of the trial. N.J.S.A. 2A:15-5.13(c); Longo v. Pleasure Prods., Inc., 215 N.J. 48, 58 (2013). The PDA caps the amount of punitive damages that may be assessed against a defendant to the greater of five times the sum of the compensatory damages or $350,000. N.J.S.A. 2A:15-5.14(b).

The decision to award or deny punitive damages "rests within the sound discretion of the trier of fact." Leimgruber, 73 N.J. at 456; Accord Maudsley v. State, 357 N.J. Super. 560, 590 (App. Div. 2003). However, "[t]he PDA envisions an active role for the trial court in reviewing the jury's determinations." Pritchett I, 248 N.J. at 109. Thus, N.J.S.A. 2A:15-5.14(a) provides:

> Before entering judgment for an award of punitive
> damages, the trial judge shall ascertain that the award
> is reasonable in its amount and justified in the
> circumstances of the case, in light of the purpose to
> punish the defendant and to deter that defendant from
> repeating such conduct. If necessary to satisfy the
> requirements of this section, the judge may reduce the
> amount of or eliminate the award of punitive damages.

A-1414-21

12

The PDA requires juries to consider the following factors:

> (1)  The likelihood, at the relevant time, that serious harm would arise from the defendant's conduct;
>
> (2)  The defendant's awareness [or] reckless disregard of the likelihood that the serious harm at issue would arise from the defendant's conduct;
>
> (3)  The conduct of the defendant upon learning that its initial conduct would likely cause harm; and
>
> (4)  The duration of the conduct or any concealment of it by the defendant.
>
> [N.J.S.A. 2A:15-5.12(b).]

The PDA governs punitive damages in LAD cases.  Saffos v. Avaya Inc., 419 N.J. Super. 244, 264 (App. Div. 2011).  However, actions under the LAD are excluded from the PDA's statutory cap.  N.J.S.A. 2A:15-5.14(c); Baker, 161 N.J. at 231.

"[P]unitive damages are only to be awarded in exceptional cases even where the LAD has been violated."  Saffos, 419 N.J. Super. at 263 (alteration in original) (quoting Catalane v. Gilian Instrument Corp., 271 N.J. Super. 476, 500-01 (App. Div. 1994)).  "To be exceptional, the defendant's conduct must 'ris[e] to the level of wanton or reckless conduct.'"  Ibid. (alteration in original) (quoting Catalane, 271 N.J. Super. at 501).

"In addition, there are substantive constitutional limits on the amount of punitive damages that a jury may award."  Baker, 161 N.J. at 229.  Those limits

are imposed by the Due Process Clause of the Fourteenth Amendment and serve "to ensure that punitive damages awards are made through a fair process that includes judicial review of awards." Ibid.

"[C]ourts must examine the substantive basis of the punitive damages award to determine whether it is so excessive as to violate due process." Id. at 230. As noted, courts must consider the following three factors when conducting its review:

> [(1)] the degree of reprehensibility of the conduct that formed the basis of the civil suit; [(2)] the disparity between the harm or potential harm suffered by the injured party who was the plaintiff in the civil case and the plaintiff's punitive damages award; and [(3)] the difference between this remedy and the civil penalties authorized or imposed in comparable cases.
>
> [Ibid. (quoting BMW, 517 U.S. at 575).]

"[T]he award of punitive damages '"must bear some reasonable relation to the injury inflicted and the cause of the injury."'" Ibid. (quoting Herman, 133 N.J. at 338 (quoting Leimgruber, 73 N.J. at 457)).

In addition, special consideration is given in cases involving public entities. In Lockley, the Court stated that "the court's responsibility to review awards of punitive damages for reasonableness is heightened." 177 N.J. at 433.

> The judge in the ordinary case acts as a check on the jury's calculation of punitive damages; in the case of a governmental entity, when public monies are the source of the award, the judge must scrutinize with great care

the amount of the award to determine whether it is proportionate to the harm suffered by the plaintiff.

[Ibid.]

In the case of public entities,

> concepts of wealth and ability to pay are irrelevant . . . because public entities do not create their own wealth and are not driven by a profit motive. The State cannot be deterred by an award based on its "bottom line" because it does not have one in the private sector sense.

[Id. at 431 (footnote omitted).]

That is not to say, "however, that the deterrent effect is absent in actions against a public entity." Ibid. "[P]unitive damages . . . constitute a stringent corrective and potent deterrent against egregious wrongdoing by upper-level supervisory government officials." Ibid. (quoting Abbamont v. Piscataway Twp. Bd. of Educ., 138 N.J. 405, 429 (1994), superseded by statute on other grounds, N.J.S.A. 34:19-5). But because ""public monies are the source of the award,"" there are "'rigorous standards for the calculation of punitive damages against a public entity.'" Pritchett I, 248 N.J. at 106-07 (quoting Green, 177 N.J. at 444 (quoting Lockley, 177 N.J. at 433)).

Defendant urges this court to adopt a de novo standard of review when considering both the reasonableness and substantive due process of a punitive damages award imposed against a public entity. We decline to do so.

We use a hybrid standard of review when considering an award of punitive damages. We accord a deferential standard of review to a judge's determination of whether the jury's punitive damages award is "reasonable" and "justified in the circumstances of the case" under N.J.S.A. 2A:15-5.14(a). See Saffos, 419 N.J. Super. at 264 (affirming a judge's decision to reduce, but not eliminate, a punitive damages award under N.J.S.A. 2A:15-5.14(a)); Tarr v. Bob Ciasulli's Mack Auto Mall, Inc., 390 N.J. Super. 557, 565 (App. Div. 2007) (affirming a judge's decision not to reduce an award under N.J.S.A. 2A:15-5.14(a)), aff'd, 194 N.J. 212 (2008). Cf. Cooper Indus., Inc. v. Leatherman Tool Grp., Inc., 532 U.S. 424, 433 (2001) (noting that in the absence of a constitutional issue, a federal appellate court applies "an abuse-of-discretion standard" when reviewing a trial court's scrutiny of jury award of punitive damages (quoting Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 279 (1989))).

However, when a party challenges the punitive damage award on constitutional due process grounds, we review the trial court's decision as to the amount of the punitive damage award de novo because the determination is "not really a 'fact tried by the jury.'" Baker v. Nat'l State Bank, 353 N.J. Super. 145, 152 (App. Div. 2002) (quoting Cooper Indus., 532 U.S. at 437). The purpose of de novo review in such cases is to ensure that an award is not "so excessive as

to violate substantive due process." Id. at 153. (citing BMW, 517 U.S. at 585-86). We accord no special deference "to a trial court's findings of fact and conclusions of law." Ibid.

Defendant challenges the constitutionality of the amount of the punitive damages award. Therefore, we apply a de novo standard. Id. at 152.

Defendant is a public entity. Thus, as our Supreme Court explained in its remand instructions to the trial court, "a more rigorous application" of the Baker/BMW factors is required. Pritchett I, 248 N.J. at 110. That is not to say that additional steps need to be taken in the analysis; rather, defendant's status as a public entity is but one consideration in the "holistic assessment." Id. at 110-11. Because "'public monies are the source of the award,'" trial courts need to "be vigilant in their review of such awards." Green, 177 N.J. at 444 (quoting Lockley, 177 N.J. at 433).

Against this framework we consider each of the Baker/BMW factors. In discussing the first factor, the United States Supreme Court has explained, "[T]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 419 (2003) (alteration in original) (quoting BMW, 517 U.S. at 575). Courts evaluate

> the reprehensibility of a defendant by considering
> whether: the harm caused was physical as opposed to

> economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.
>
> [Saffos, 419 N.J. Super. at 266 (quoting State Farm, 538 U.S. at 419).]

It should be presumed, however that "a plaintiff has been made whole for [their] injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence." Ibid. (quoting State Farm, 538 U.S. at 419).

As we previously stated, "[P]laintiff presented a case from which the jury could have found especially egregious conduct by clear and convincing evidence." Pritchett, slip op. at 79 (emphasis added). The evidence demonstrated that defendant was aware of plaintiff's MS diagnosis in November 2011, but failed to notify its ADA coordinator, resulting in the denial of plaintiff's opportunity "to engage in the interactive process" required in a request for accommodation situation. Plaintiff was forced to retire early as a result of defendant's actions, suffering economic harm. Given plaintiff's medical condition, she was also financially vulnerable. Upper management made the decision to deny plaintiff's leave requests and ignored the advice of HR

personnel.  After plaintiff instituted litigation, defendant revised the JJC's Leave of Absence policy to state that leaves would be subject to the approval of management and possible reasonable accommodation through the ADA coordinator.  There is ample evidence to find defendant's conduct was reprehensible and warranted a substantial punitive damages award.

As to the second Baker/BMW factor, in reviewing "the disparity between the actual . . . harm suffered by . . . plaintiff and the punitive damages award," "[t]he measure of punishment [must be] both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." Saffos, 419 N.J. Super. at 266, 268-69 (second alteration in original) (quoting State Farm, 538 U.S. at 418, 426).  To evaluate if an award is reasonable and proportionate, courts "must recognize that emotional distress damages often contain a punitive element."  Id. at 269 (citing State Farm, 538 U.S. at 426).  The risk that an emotional damages award contains a punitive aspect is greater where physical harm or psychological treatment is absent.  Ibid.

Here, plaintiff presented little evidence regarding her emotional distress. She was not receiving psychological treatment and she did not present any evidence that her emotional distress resulted in any medical diagnoses. Therefore, it is reasonable to assume that the jury's award of $575,000 in emotional distress damages contained a punitive aspect.  As a result, and guided

A-1414-21

19

by Saffos, we deem it appropriate on these facts to subtract the emotional distress award from the total compensatory award, leaving a compensatory-damage base of $1,249,911. The punitive damages award of $10 million is approximately seven times greater than that amount. While we acknowledge this is a high ratio, we also recognize that sole reliance on a bright-line ratio or cap is "impermissible," as the ratio is only considered as part of the holistic assessment. See Pritchett I, 248 N.J. at 113. As stated, the PDA's limitation on the amount of punitive damages is not applicable here. N.J.S.A. 2A:15-5.14(c); Baker, 161 N.J. at 231.

Finally, as to the third Baker/BMW factor, "the difference between the punitive damages awarded and the civil penalties authorized" under the LAD, the LAD provides for a civil fine not to exceed $50,000. Saffos, 419 N.J. Super. at 269 (citing State Farm, 538 U.S. at 418); N.J.S.A. 10:5-14.1a. As we stated in Saffos, we find the comparison between the punitive damage award and the authorized civil penalty is "not particularly helpful in determining the propriety of the amount of punitive damages." 419 N.J. Super. at 269.

In sum, after a de novo review, we have considered the Baker/BMW factors using the heightened scrutiny required under Lockley. Defendant's behavior was especially egregious. Upper management behaved reprehensibly in blithely dismissing plaintiff's request for an unpaid leave of absence to

accommodate treatment for her newly diagnosed MS. Upper management ignored the advice of defendant's HR personnel. As noted in BMW and Pritchett I, this factor is the dominant factor and "[p]erhaps the most important." 517 U.S. at 575; 248 N.J. at 112.

Although the ratio of the compensatory damages award to the punitive damages award (after subtracting the emotional distress damages component) is substantial, we cannot conclude the award is unreasonable or disproportionate to the inflicted injury. Punitive damages are available in an LAD action against a public entity. The Legislature expressly chose not to impose a cap on such damages when it exempted the LAD from the limits imposed on other actions under the PDA. See N.J.S.A. 2A:15-5.14(b) to (c). Where defendant acted with such disregard for the LAD, the ratio is not dispositive.

After having reviewed the award with great care in light of defendant's status as a public entity, we find the award appropriate to deter future unlawful conduct. We are mindful the source of the damages award is public funds, but nevertheless have considered the remedial nature of the LAD statute and the expectation "that public officials will be motivated to avoid misconduct that exposes the State to financial sanction in the form of punitive damages if only because of the stigma attached to the judgment." Lockley, 177 N.J. at 431. This

award serves the purpose of encouraging high-level officials to conform their behavior.

Therefore, we reject defendant's challenge of the punitive damages award on substantive due process grounds.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1414-21

22