SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court. In the interest of brevity, portions of an opinion may not have been summarized.

**Shelley Pritchett v. State (A-5-20) (084451)**

**Argued March 1, 2021 -- Decided August 12, 2021**

**LaVECCHIA, J., writing for a unanimous Court.**

In this appeal, the Court considers the standards to be applied by a trial court when reviewing a jury award of punitive damages against a public entity.

Plaintiff Shelly Pritchett worked for the Juvenile Justice Center (JJC), which runs the state's juvenile correctional facilities. She was diagnosed with multiple sclerosis. When her second request for unpaid leave was denied, her supervisor refused to explain the denial or put the denial in writing. On November 1, 2011, Pritchett learned that she would be subject to disciplinary proceedings -- which would result in her termination without a pension -- if she did not resign by the end of the week. Pritchett applied for retirement disability benefits on November 4. Weeks later, her union representative informed the JJC that Pritchett believed she was forced into retirement against her will. The JJC's Equal Opportunity Office expressed its opinion that the JJC "failed to engage in the interactive process," which "resulted in a violation of the State Anti-Discrimination Policy," but opined that Pritchett's "request for reinstatement [was] mooted by [her] approval for disability retirement."

Pritchett filed a complaint alleging the State violated the New Jersey Law Against Discrimination (LAD). The jury awarded Pritchett compensatory damages in excess of $1.8 million and punitive damages of $10 million, and the State challenged the punitive damages award. The trial court determined that the punitive damages amount was high but that no miscarriage of justice occurred. The Appellate Division affirmed in large part but remanded for reconsideration of the punitive damages award, calling upon the trial court to consider the factors discussed in Baker v. National State Bank, 161 N.J. 220 (1999), and BMW of North America, Inc. v. Gore, 517 U.S. 559 (1996).

The State petitioned for certification, arguing that the Appellate Division's remand instructions were flawed in part because they failed to include direction to the trial court, consistent with this Court's holding in Lockley v. Department of Corrections, 177 N.J. 413 (2003), to apply heightened scrutiny when reviewing awards of LAD punitive damages against public entities. The Court granted certification. 244 N.J. 154 (2020).

1

**HELD:**  As the Appellate Division instructed, the trial court on remand must (1) substantially consider the factors advanced in BMW and incorporated into New Jersey law by Baker and (2) must "ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered," in keeping with the guidance in State Farm Mutual Automobile Insurance Co. v. Campbell, 538 U.S. 408, 425-26 (2003).  The Court modifies the Appellate Division's instructions to add that the trial court -- and all trial courts reviewing a punitive damages award issued by a jury against a public entity defendant -- must also apply the heightened scrutiny called for in Lockley and underscored in the companion case of Green v. Jersey City Board of Education, 177 N.J. 434 (2003).

1.  The Court reviews the history of punitive damages awards against public entities in LAD actions, from the establishment of requirements for punitive damages awards against private entities in LAD actions, see Lehmann v. Toys 'R' Us, Inc., 132 N.J. 587, 593, 624-25 (1993); to the Court's initial three-three split over whether punitive damages may be recovered from a public entity for a claim against a public entity under the Conscientious Employee Protection Act, which split resulted in the affirmance in that matter of the Appellate Division's allowance of such damages against the defendant, see Abbamont v. Piscataway Twp. Bd. of Educ., 138 N.J. 405, 417-19 (1994); to the first precedential holding by a majority of the Court that public entities are "liable for punitive damages under the [LAD]," see Cavuoti v. N.J. Transit Corp., 161 N.J. 107, 113-14 (1999).  (pp. 16-23)

2.  On the same day that Cavuoti issued, in another LAD action not involving a public entity, the Court, in Baker, assessed the effect of the Legislature's adoption of the Punitive Damages Act (PDA), observing that the Act "requires that a court reviewing an award of punitive damages be satisfied that the award is 'reasonable in its amount' and is justified in the circumstances of the case 'in light of the wrongful conduct.'"  161 N.J. at 229.  Baker noted that "[a]lthough the PDA excludes LAD actions from its cap, its general requirements for procedural and substantive fairness are mandated"; the opinion also stressed that there are "substantive constitutional limits on the amount of punitive damages that a jury may award."  Ibid.  Recognizing the three factors articulated in BMW for courts to consider when reviewing punitive damages awards -- "the degree of reprehensibility of the conduct that formed the basis of the civil suit; the disparity between the harm . . . suffered . . . and the plaintiff's punitive damages award; and the difference between this remedy and the civil penalties . . . imposed," see 517 U.S. at 575, -- the Baker Court instructed that courts "should apply both the requirements of the PDA (with the exception of the statutory cap) and the substantive standards of BMW v. Gore in order to ensure that any award of punitive damages bears 'some reasonable relation' to the injury inflicted."  Baker, 161 N.J. at 231.  (pp. 23-26)

3.  The Court singles out two matters of significance to this appeal:  Lockley and Green.  Lockley instructed "that the standards applied in private sector cases, with the exception

2

of those relating to the financial condition of the defendant, should be used" in assessing and reviewing punitive damages awards. Those standards include the PDA provisions for determining whether punitive damages are warranted in the first instance and for calculating the amount of such an award, as well as the Baker/BMW factors. 177 N.J. at 431-33. Importantly, Lockley cautioned trial courts that "the court's responsibility to review awards of punitive damages for reasonableness is heightened when such damages are awarded against a public entity." Id. at 433. In Green, which involved a CEPA claim against a public entity, the Court drew from Lockley and stressed that it "set rigorous standards for the calculation of punitive damages against a public entity, recognizing that 'public monies are the source of the award.'" 177 N.J. at 444. (pp. 27-31)

4. There can be no doubt that punitive damages awards under the LAD are available against public defendants. The Court recognizes the continuing vitality of Lockley, as well as that of all the cases that led up to it and compelled its result. Interpreting the Legislature's inaction following those decisions as acquiescence indicative of legislative intent to subject public entities to punitive damages under the LAD, the Court notes that further debate over that policy belongs in the legislative arena. (pp. 31-32)

5. The Court reviews the relevant mandates of the PDA and notes that, with respect to punitive damages assessed by a jury against a public entity defendant, the Court has imposed a unique and special duty. In addition to the PDA's requirement that the amount calculated by the jury be reasonable, the court must adhere to Lockley's instruction that the reasonableness assessment be subjected to heightened scrutiny. 177 N.J. at 433. The Court explains that the heightened scrutiny standard's purpose is not simply to ensure that public entities are not treated worse than private entity defendants because certain PDA ability-to-pay factors are not presented to the jury, but rather because public funds are at stake. Further, the Court explains that the Baker and BMW factors are related to due process considerations and are not a substitute for Lockley's direction for heightened trial-court review, which goes beyond keeping the award to the amount necessary to avoid transgressing due process and requires a more rigorous application of the factors to be considered when assessing the punitive damages award in the context of the factual circumstances of the wrong involved and the nature of the public entity defendant. Application of the Baker/BMW factors and those mentioned, and applicable, under the PDA are not independent assessments, but rather coalesce for a holistic assessment. See Lockley, 177 N.J. at 433. (pp. 32-36)

6. The Court finds the Appellate Division's discussion of the Baker/BMW factors to be substantially correct. The Due Process Clause imposes outer limits on the allowable size of an award of punitive damages, and the Appellate Division appropriately instructed the trial court, on remand, to substantially consider the factors advanced in BMW and incorporated into New Jersey law by Baker. The first BMW consideration -- the reprehensibility of the conduct -- is "[p]erhaps the most important," and the mental state or track record of the defendants speaks to the reprehensibility of the conduct. See

3

BMW, 517 U.S. at 575-77.  The Appellate Division also correctly highlighted State Farm's point that this analysis entails more than the rote application of bright-line ratios, a point that accords with the Legislature's exemption of the LAD from the PDA's cap on punitive damages.  In sum, the Court affirms the Appellate Division's instructions, as modified to correct the omission of the required heightened scrutiny by the trial court necessary in the case of a public sector defendant.  (pp. 37-40)

**AFFIRMED AS MODIFIED.**

**CHIEF JUSTICE RABNER and JUSTICES ALBIN, PATTERSON, FERNANDEZ-VINA, SOLOMON, and PIERRE-LOUIS join in JUSTICE LaVECCHIA's opinion.**

# SUPREME COURT OF NEW JERSEY
## A-5 September Term 2020
### 084451

Shelley Pritchett,

Plaintiff-Respondent,

v.

State of New Jersey,

Defendant-Appellant.

On certification to the Superior Court,
Appellate Division.

| Argued | Decided |
|---|---|
| March 1, 2021 | August 12, 2021 |

Peter G. Verniero argued the cause for appellant (Sills Cummis & Gross, attorneys; Peter G. Verniero, on the briefs).

Deborah L. Mains argued the cause for respondent (Costello & Mains, attorneys; Deborah L. Mains, on the brief).

Robert F. Renaud argued the cause for amici curiae New Jersey State League of Municipalities and New Jersey Institute of Local Government Attorneys (Renaud DeAppolonio, attorneys; Robert F. Renaud, on the brief).

Nancy Erika Smith argued the cause for amicus curiae New Jersey Association for Justice (Smith Mullin, attorneys; Nancy Erika Smith and Zachary Silverman, of counsel and on the brief).

1

Thaddeus P. Mikulski, Jr. submitted a brief on behalf of amicus curiae National Employment Lawyers Association of New Jersey (Thaddeus P. Mikulski, Jr., on the brief).

JUSTICE LaVECCHIA delivered the opinion of the Court.

Following a trial, a jury awarded plaintiff Shelley Pritchett more than $1.8 million in compensatory damages for her employer's violations of the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49, as well as $10 million in punitive damages. The defendant State of New Jersey appealed, and the Appellate Division affirmed in large part but remanded the matter for the trial court to reconsider the punitive damages award, calling upon the court to substantially consider the factors discussed by this Court in Baker v. National State Bank, 161 N.J. 220 (1999), and the United States Supreme Court in BMW of North America, Inc. v. Gore, 517 U.S. 559 (1996).

The State argues that the Appellate Division's remand instructions were flawed because, among other reasons, they failed to include direction to the trial court, consistent with this Court's holding in Lockley v. Department of Corrections, 177 N.J. 413 (2003), to apply heightened scrutiny when reviewing awards of LAD punitive damages against public entities. Pritchett responds

2

that the remand instructions were adequate and that <u>Lockley</u> did not alter the <u>Baker</u>/<u>BMW</u> analysis. Several amici also appeared before the Court.

We agree with the State that the Appellate Division's remand instructions require modification. In reviewing the punitive damages award, the trial court failed to apply the heightened scrutiny called for in <u>Lockley</u> and underscored in the companion case of <u>Green v. Jersey City Board of Education</u>, 177 N.J. 434 (2003). The Appellate Division's instructions did not correct that inadequacy. While we commend the Appellate Division for instructing the trial court to consider the <u>Baker</u>/<u>BMW</u> factors more fully, the Appellate Division's remand instructions should have also alerted the trial court to the principles of <u>Lockley</u> and <u>Green</u> that apply in this matter.

We thus affirm the Appellate Division's judgment with modification to the remand instructions that must guide this trial court, and others, in the review of a punitive damages award against a public entity.

I.

A.

The following facts were presented at the trial in this matter.

Pritchett was hired by the Juvenile Justice Center (JJC) in 2006. The JJC runs the state's juvenile correctional facilities and has approximately 400 employees at any given time. Pritchett worked as a corrections officer in a JJC

3

facility, and, by 2011, she held the title of Senior Corrections Officer. Her duties included the responsibility to intervene when violence broke out among inmates.

On June 8, 2011, Pritchett broke up a fight between two inmates. As a result, she suffered injuries to her back, knee, and neck, went on Workers' Compensation leave, and sought medical assistance.

In the fall of that year, Pritchett's physician noticed that an MRI of Pritchett's spine revealed abnormalities unrelated to her workplace injuries. Because of those abnormalities and Pritchett's physical complaints, her physician suspected that Pritchett was suffering from the early stages of multiple sclerosis (MS). In a note dated September 17, 2011, her physician wrote that Pritchett had recovered from her workplace injuries and could return to work with no restrictions on their account, but the doctor recommended that Pritchett ask for additional leave time to seek a diagnosis and treatment for her underlying health issues and referred her to a neurologist.

Consistent with the physician's recommendation, Pritchett submitted a request for unpaid leave from her JJC position. Two days later, human resources (HR) officers forwarded the request to the Acting Director of the JJC, Captain Kelly Gibson, and to Pritchett's direct supervisor, Lisa Quinto. An internal email to Gibson indicates that HR had planned to approve the

4

request; however, Captain Gibson was against it. HR then turned for support to Quinto, who, on September 27, emailed Gibson, telling him that Pritchett's "diagnosis is rather serious." She went on, "[y]ou may wish to consider approving this leave through November 1, 2011. This way we can write to her now and advise her no further leave will be approved beyond November 1 and if she is not medically cleared to return to work, she must resign." Quinto explained to Captain Gibson,

> If you determine she must return to work now, based on the medical, there will be no way she can return and we really have not given her warning that management will not approve further leave beyond a request to extend. If she cannot return in November and does not resign, you will have a stronger case to take steps to remove her and be more readily able to defend the removal in an appeal setting. Since [it's] only one plus month, we can give her fair warning she must return and then if she does not, you stand a much better chance of winning an appeal.

Nonetheless, Captain Gibson remained committed to denying Pritchett's request. HR then sought out the JJC's Deputy Executive Director for Operations, Felix Mickens, forwarding him Quinto's exchange with Gibson and adding that

> [t]o deny leave at this point will surely result in a removal (she has a very serious diagnosis) which will be appealed and not upheld. She will not be able to return to work (she incurred a work-related injury which resulted in the discovery of an unrelated personal

5

medical condition) and we have not advised her management will not approve further leave. With removals we have established a winning defense. . . .

November is right around the corner -- management should approve leave through this date as the medical states -- we will write to her and say no further leave -- if she does not, or cannot return, she can resign [or] we can initiate removal for failure to return from an approved leave of absence.

Pritchett's request was ultimately approved on October 11, granting her unpaid leave through November 1, 2011, but the approval came with the caveat that no further requests would be granted. She was informed that if she did not return to work on November 2, she would be expected to resign.

On October 19, Pritchett was diagnosed with MS. She requested additional leave time through February 29, 2012, with an expected return-to-work date of March 1. Gibson and Quinto both denied the request in internal emails. Upon receiving word of the denial, Pritchett telephoned Quinto, who would not provide an explanation as to why the JJC denied Pritchett's request. Instead, she told Pritchett that the JJC was not obligated to give her a reason, and then declined to put the denial in writing.

When November 1 came, Pritchett wrote to the JJC's HR manager, stating that she was not able to return to work, but that she did not want to resign. Mickens answered the letter through Pritchett's union representative, telling her that Pritchett would be subject to disciplinary proceedings -- which

6

would result in her termination without a pension -- if she did not resign by the end of the week. Pritchett submitted an application for retirement disability benefits on November 4.

Thereafter, on November 21, Pritchett's union representative contacted the JJC's Americans with Disabilities Act (ADA) coordinator, informing the coordinator that Pritchett believed she was forced into retirement against her will. The coordinator answered that since Pritchett had already resigned, it was too late to engage in the ADA's interactive process and advised Pritchett to contact the JJC's Equal Opportunity Office. When it responded to Pritchett's request for reinstatement, that Office expressed its opinion that the JJC "failed to engage in the interactive process . . . . This failure to engage in the interactive process resulted in a violation of the State Anti-Discrimination Policy." However, the Office agreed with the ADA coordinator that Pritchett's "request for reinstatement [was] mooted by [her] approval for disability retirement."

B.

1.

In October, 2013, Pritchett filed a complaint against the State of New Jersey and unnamed John Does, alleging that the State violated the LAD by failing to accommodate her disability and discriminating based on the

7

perception of disability.  Following the State's unsuccessful attempts to end the matter through motion practice, the trial court conducted a jury trial in June 2017.

The trial resulted in the jury's return of a liability verdict in favor of Pritchett.  The jury awarded compensatory damages totaling $1,824,911, which consisted of $575,000 for emotional distress; $343,789 in back pay; $472,639 in front pay; and $433,483 in future pension benefits.

The next day, the court reconvened the jury for a proceeding on punitive damages, during which the parties presented no new evidence.  The jury's deliberations were brief, lasting from shortly after 2:00 p.m. until about 3:00 p.m.

The jury awarded Pritchett $10 million in punitive damages.  All totaled, the trial court entered a judgment of $12,015,384.44 for Pritchett.  That amount encompassed $78,367.65 in pre-judgment interest; $22,235.79 in costs; $11,824,911 in compensatory and punitive damages; and $89,870 in attorneys' fees.

2.

On September 29, 2017, the trial court heard argument from the parties once more on the punitive damages awarded by the jury.

8

The State urged the court not to approve the jury's punitive damage award, contending that the JJC's conduct "was not especially egregious," that the State was entitled to certain protections under the Punitive Damages Act (PDA or the Act), N.J.S.A. 2A:15-5.9 to -5.17, including the PDA's cap on punitive damages, and that jurisprudence from the United States Supreme Court addressing a constitutionally acceptable ratio of compensatory-to-punitive damages cautioned against the trial court's approval of the jury's punitive damages award.

Pritchett countered each of the State's arguments and urged the court to enter judgment approving the punitive damages awarded by the jury.

In an oral decision, the trial court granted that, "looking at the BMW factors," the amount of punitive damages was high but concluded that no miscarriage of justice occurred due to the size of the jury's award. The court emphatically stated

> that the eight jurors that sat on this case, the Court got no indication that they were confused, impassioned, prejudiced, biased, inflamed. Rather, what the Court observed was a jury that was intelligent, was one that asked lots of questions, one that took notes, one that was deliberative, one that was impartial and dispassionate and weighed through the evidence here and it's not now for this Court to make the decision, they made the decision and their decision was clearly within the realm of what I would consider to be reasonable given their conclusion as to the way the defendant's conduct was, the way the plaintiff was

9

treated, and also the way this case was defended. . . . It was completely reasonable for the jury to come to the conclusions that they made.

## C.

The State appealed and, in an unpublished opinion, the Appellate Division affirmed the finding of liability and the compensatory damages awarded by the jury, "but remand[ed] for further proceedings . . . on the amount of punitive damages."

The Appellate Division, quoting its earlier decision in Kluczyk v. Tropicana Products, Inc., explained that "while the amount of punitive damages does not depend on the award of a specific amount of compensatory damages or injury to the plaintiff, 'the award must bear some reasonable relation to the injury inflicted and the cause of the injury.'" (quoting 368 N.J. Super. 479, 497 (App. Div. 2004) (quoting, in turn, Smith v. Whitaker, 160 N.J. 221, 242-43 (1999))). To ensure that requisite relationship, the Appellate Division stated courts are to apply the factors that were articulated by the United States Supreme Court in BMW and imported into our state's jurisprudence by Baker. In its words, the Appellate Division "remand[ed] for substantial consideration of the Baker/BMW factors."

Further, the Appellate Division offered additional guidance. It observed that the United States Supreme Court has "decline[d] . . . to impose a bright-

10

line ratio which a punitive damages award cannot exceed," quoting State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 425 (2003), but nonetheless cautioned that double-digit multipliers are unlikely to comport with due process. By the Appellate Division's calculations, the ratio of punitive-to-compensatory damages in Pritchett's case was below 7:1, a figure viewed as likely not constitutionally suspect. The Appellate Division also commented that although courts should take heed of the PDA's normative ratio of 5:1 when considering awards of punitive damages for successful LAD claims, the legislative exemption of LAD claims from the PDA cap suggests that "at least in some cases, a higher ratio would be appropriate." And, noting that the maximum civil penalty for LAD violations is limited to $50,000, the court inferred from the Legislature's exemption of LAD actions from the PDA's cap on damages "that the Legislature did not consider civil penalties under the LAD to be related to the appropriate recovery by an aggrieved individual."

The State petitioned for certification, alleging that the Appellate Division's remand instructions were flawed and provided inadequate guidance given that a punitive damages award against a public entity is at issue. We granted the petition, 244 N.J. 154 (2020), and allowed to participate as amici curiae the New Jersey State League of Municipalities, the New Jersey Institute of Local Government Attorneys, the National Employment Lawyers

11

Association of New Jersey (NELA), and the New Jersey Association for Justice (NJAJ).

II.

A.

Before this Court, the State advances five main points. First, the State emphasizes that, in Lockley, this Court required trial courts, as part of their gatekeeping function, to use great care in scrutinizing awards of punitive damages against public entities. The State asserts that the trial court failed to do that, and the Appellate Division's remand instructions are silent on that essential point. Second, the State argues that because in any punitive damages case there is a significant chance that the jury has been inflamed, it is important that courts not rely exclusively on the application of the Baker/BMW factors to ensure that there is a reasonable relation between the actual harm suffered and the damages awarded. Third, the State asserts that the Appellate Division's view on the relevance of LAD statutory penalties is inconsistent with Lockley. Fourth, the State argues that Baker and Lockley meant to impose limiting standards and the Appellate Division's interpretative directions are inconsistent with those opinions in that they essentially provide trial courts and litigants with guidance on how to circumvent those cases' guardrails. Specifically, the State urges this Court to view the absence of any

12

legislative action following the <u>Lockley</u> decision "to mean that lawmakers were satisfied with all parts of that decision, including the heightened standard of review in public entity cases, coupled with the requirement for proportionality." Finally, the State argues that the Appellate Division "diminished" this Court's instruction that even though the 5:1 bright-line ratio of punitive to compensatory damages does not apply in LAD cases, it still serves as a normative measure.

The New Jersey State League of Municipalities and New Jersey Institute of Local Government Attorneys ask the Court to reconsider the decades-old determination that punitive damages are available against public entities. They echo the State in emphasizing that it is the taxpayer who pays every such award and reason that such damages fail to deter misconduct by defendants who themselves do not bear the brunt of the punishment. Exacting punitive damages from public-sector defendants is also problematic, in their view, because not all such defendants are of comparable means, meaning that the small municipality is comparatively more severely punished than the metropolitan government by what is, on paper, the same amount of damages.

B.

The cornerstone of Pritchett's position is that "<u>Lockley</u> did not alter the <u>Baker</u>/<u>BMW</u> factors." According to Pritchett, <u>Lockley</u> was ultimately about

13

the proportionality of compensatory and punitive damages, and, to the extent that <u>Lockley</u> and <u>Baker</u>/<u>BMW</u> overlap, it is because <u>Lockley</u> is part of the <u>Baker</u>/<u>BMW</u> inquiry. All that <u>Lockley</u> did, according to Pritchett, was to hold, first, that a public-entity defendant's ability to pay a damages award was not a relevant consideration in the review of an award, and second, that public-sector defendants are not to be treated any worse than their private-sector counterparts. "Thus, when the Appellate Division remanded the question of the amount of punitive damages to the trial court for 'substantial consideration of the <u>Baker</u>/<u>BMW</u> factors' it did not deviate from any decision by this Court."

NELA points out that the Legislature has not corrected this Court's prior holdings that punitive damages are recoverable in LAD actions against public entities. Further, NELA maintains that <u>Lockley</u> did not impose a heightened standard of review for such awards, and the Appellate Division's remand instructions captured the essence of the applicable law, insofar as they require the trial court to engage in a holistic analysis when reviewing and approving the jury's punitive damages award in a LAD action. During argument, NELA asserted that there have been no runaway awards of punitive damages against public entities.

14

The NJAJ similarly maintains that <u>Lockley</u> did not impose a heightened standard, and emphasizes that the lack of legislative action in this area should be interpreted as allowing for the uncapped recovery of punitive damages.

## III.

## A.

This appeal concerns the standards to be applied by a trial court when reviewing a jury award of punitive damages against a public-sector defendant. The State does not ask this Court to reconsider and overturn our precedent holding that punitive damages are available in LAD actions filed against public entities. To the extent that some amici advance that argument, we decline the invitation, for several reasons.

First, amici "must accept the case before the court as presented by the parties and cannot raise issues not raised by the parties." <u>State v. Lazo</u>, 209 N.J. 9, 25 (2012) (quoting <u>Bethlehem Twp. Bd. of Educ. v. Bethlehem Twp. Educ. Ass'n</u>, 91 N.J. 38, 48-49 (1982)). More fundamentally, the ship has sailed on the question of the availability of punitive damages awards in LAD actions against public entities.[1] A review of the history of the issue amply

---

[1] We address in this case an LAD action but the law's development in this area has advanced in tandem for punitive damages awards against public entities in CEPA actions.

15

demonstrates that it is time to accept that such change can only come from the Legislature.

B.

The lead up to the present matter begins with Lehmann v. Toys 'R' Us, Inc., in which a female employee brought an LAD action against the defendants for fostering a hostile work environment. 132 N.J. 587, 593 (1993). When the matter reached this Court, because the LAD expressly provides for punitive damages but includes no guide on their amount, we took the opportunity to announce "standards to apply to assess employer liability not only for equitable remedies but also for compensatory damages and punitive damages." Id. at 616. The Court held that a punitive damages award requires "a greater threshold than mere negligence," id. at 624; that such damages are appropriate "when the wrongdoer's conduct is especially egregious," ibid. (quoting Leimgruber v. Claridge Assocs., 73 N.J. 450, 454 (1977)); and that "the employer should be liable for punitive damages only in the event of actual participation by upper management or willful indifference," id. at 625 (collecting cases).

The question of whether such punitive damages were available against a public entity defendant, however, was not before the Court. That setting posed additional issues, including whether the common law view of the deterrent

16

policy advanced by punitive damages was furthered by awards against public entities.

Those questions remained unresolved for a period of time, and they arose first in a separate, but related, statutory claim setting, not in an LAD matter. Abbamont v. Piscataway Township Board of Education initially addressed the availability of punitive damages against a public entity in an action brought under the Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -8. 138 N.J. 405, 410 (1994). In that case, the plaintiff, a public-school employee had, for several years, "expressed concern about the poor health and safety conditions of the metal shop." Id. at 410-12. Eventually, he was not rehired, and he filed a CEPA action claiming retaliation and seeking, among other remedies, punitive damages. Id. at 413. A jury rendered a verdict in his favor, but the trial court granted the defendant's "motion to dismiss the complaint, upon which it had previously reserved decision." Ibid. The Appellate Division reinstated the complaint and the verdict, but could not agree on whether punitive damages under CEPA are available against a public sector entity -- two judges ruling in favor of the plaintiff and one in favor of the defendant. Ibid.

A six-member composition of this Court could not agree on the issue either, splitting three-three on that question. Id. at 426, 435-36.

17

The Court was unanimous, however, in agreeing "that the analysis and principles of Lehmann" construing the LAD should guide consideration of the elements of a CEPA claim as well as CEPA's liability standards. Id. at 417. Further, in the contexts of both the LAD and CEPA, "employers are best situated to avoid or eliminate impermissible vindictive employment practices, to implement corrective measures, and to adopt and enforce employment policies that will serve to achieve the salutary purposes of the respective legislative mandates." Id. at 418.

The Court also cited Lehmann to support the conclusion that "a strict[] standard for imposing liability for punitive damages is appropriate in CEPA actions." Id. at 419. Therefore, as in LAD actions, "the employer should be liable for punitive damages [under CEPA] only in the event of actual participation by upper management or willful indifference." Ibid. (quoting Lehmann, 132 N.J. at 625). And the complained-of conduct must be especially egregious. Ibid.

Addressing the issue that split the Appellate Division -- whether a party may recover punitive damages from a public entity for a violation of CEPA -- Justice Handler wrote,

> A sensible and unconstrained reading of the language of CEPA, a consideration of the provisions of CEPA in light of the Tort Claims Act (TCA), N.J.S.A. 59:1-1 to 59:13-5, a review of CEPA's legislative history, an

18

understanding of the underlying policy concerns in awarding punitive damages against public entities, and an examination of CEPA's remedial purpose persuade us that CEPA does allow the award of punitive damages against public entities.

[Id. at 426.]

That portion of Justice Handler's opinion read the plain language of CEPA as indicating that the Legislature intended to make punitive damages available against such defendants, highlighting CEPA's definition in N.J.S.A. 34:19-2(a) of "employer," under which the board neatly fit, and N.J.S.A. 34:19-5, which authorized an award of punitive damages to prevailing plaintiffs. Ibid. The Court noted that, in contrast to the Tort Claims Act, "no specific CEPA provision exists that precludes the awarding of punitive damages against public employers." Ibid.

Although the three members who agreed with the Appellate Division on this issue "acknowledge[d] the strength of the considerations militating against punitive damages visited upon governmental bodies," id. at 428-29, they inferred that the Legislature had those considerations in mind when it did not exempt governmental bodies from liability for punitive damages in CEPA actions, stating that "[w]hen the interest transgressed is significant, punitive damages may be appropriate even when the underlying wrongful conduct is that of the government." Id. at 429. In concluding, Justice Handler wrote that

19

the Court "thus defer[red] to the Legislature in including punitive damages in the remedial arsenal available against public as well as private employers for especially virulent retaliatory conduct." Id. at 429-30.

Writing on behalf of himself and two others, Justice Pollock dissented from the part of the Court's opinion that concluded that the Legislature intended to allow awards of punitive damages to be entered against public entities. Id. at 435 (Pollock, J., concurring in part and dissenting in part). Justice Pollock was concerned that "[u]ltimately, the cost of any punitive-damage award will be borne by the taxpayers of Piscataway Township." Ibid. The dissenters "doubt[ed] that the Legislature, when enacting CEPA, thought that it was overcoming the [TCA's ban] on awarding punitive damages against public entities" and, in light of that ban, did not read the portions of CEPA that make available to prevailing plaintiffs "'[a]ll remedies available in common law tort actions'" to encompass punitive damages against public entities. Id. at 435-36 (quoting N.J.S.A. 34:19-5) (third alteration in original). Further, the dissent described CEPA's legislative history as "sparse" and "enigmatic," and "believe[d] that not permitting punitive-damage awards against public employers is more consistent with the legislative intent." Id. at 436. "The best solution," in the dissent's view, "would be for the Legislature to revisit the issue and resolve it definitively." Ibid.

After the <u>Abbamont</u> decision involving CEPA, a precedential holding issued from this Court in 1999, when a majority of the Court squarely held that public entities are also "liable for punitive damages under the [LAD]" relying explicitly on "the basis of the reasoning of the three-member affirmance in <u>Abbamont</u>." <u>Cavuoti v. N.J. Transit Corp.</u>, 161 N.J. 107, 113-14 (1999).

The plaintiff in <u>Cavuoti</u> brought an LAD age discrimination case against his public employer, New Jersey Transit Corporation (NJT), and won a jury verdict that awarded him $222,323 in compensatory damages and $1 million in punitive damages. <u>Id.</u> at 115. The Appellate Division affirmed in all respects except the punitive damages award, determining "that the trial court had not instructed the jury" as to the predicate role that upper management must play to make such awards available. <u>Ibid.</u>

The case thus provided a second opportunity to consider the punitive damages issue concerning public sector defendants, but this time in the LAD setting. The Court's analysis covered numerous points, beginning with N.J.S.A. 10:5-13, which makes all common law tort remedies "available to prevailing plaintiffs." <u>Id.</u> at 116 (quoting N.J.S.A. 10:5-13). The Court further noted the legislative direction to give the LAD liberal construction to combat discrimination and <u>Lehmann</u>'s holding that punitive damages are available under the LAD. <u>See id.</u> at 116-17. Importantly, the <u>Cavuoti</u> Court

21

also recounted the extensive analysis of the issue in Abbamont, including Abbamont's acknowledgement of "the strength of the considerations militating against punitive damages against governmental bodies." Id. at 132.

In the end, the Court adopted the reasoning in and conclusions of Justice Handler's opinion in Abbamont, which recognized the availability of a punitive damages award against public entity defendants and imported it to LAD claims. Ibid. In doing so, the Court explained how Abbamont "reflected our understanding of the LAD," and had relied on an LAD case, Fuchilla v. Layman, 109 N.J. 319 (1988), to explain how the LAD and TCA serve different purposes, such that the LAD is not, in several notable ways, constrained by the TCA. Id. at 132-33.

The Court added that it had "observed that the policy concerns regarding the imposition of punitive damages against public entities for LAD violations were addressed, in some measure, by the heightened standard that we adopted in Lehmann for imposing punitive damages." Id. at 133. Therefore,

> a sensible and unconstrained reading of the language of the LAD, a consideration of the provisions of the LAD in light of the TCA, a review of the LAD's legislative history, an understanding of the underlying policy concerns in awarding punitive damages and an examination of LAD's remedial purposes persuade us that the LAD allows the award of punitive damages against public entities.
>
> [Ibid.]

22

Importantly, the Court found its conclusion to be reinforced by the fact that the Legislature had acquiesced in the ruling for, at that point, five years. Id. at 133-34.

But the conclusion was not unanimous. Writing again on his own behalf, and joined by two other members of the Court, Justice Pollock dissented from that holding. Id. at 135 (Pollock, J., concurring in part and dissenting in part). Justice Pollock pointed to the TCA's blanket prohibition of such damages and emphasized that "[n]othing in the LAD expressly or impliedly repeals" the TCA's prohibition. Ibid. In Justice Pollock's opinion, the putative statutory authorization for punitive damages in CEPA actions is clearer than in the LAD, but the Justice doubted the Legislature meant in either setting "to saddle taxpayers" with "paying punitive damage awards" exacted from public entities, which can often "be substantial." Ibid. The dissenters renewed the call for the Legislature to resolve the question. Id. at 136.

In Baker, another LAD action involving an award of punitive damages and released the same day as Cavuoti, the Court elaborated on the trial court's role in reviewing a jury's award of punitive damages. In doing so, the Court focused not so much on the availability of those damages as such under the statutory and common law of our state, but primarily upon then-recent United States Supreme Court case law exploring and explaining the due-process

23

implications of awards of punitive damages, in those cases, against private entities.

Baker involved an action filed by two plaintiffs against their former employer for age and gender discrimination. 161 N.J. at 223-24. The jury awarded plaintiffs compensatory damages of $135,740 and $102,241, respectively, and the two shared a punitive damages award of $4 million. Id. at 225.

Those verdicts were affirmed by the Appellate Division. Ibid. This Court's opinion in the matter assessed the effect of the Legislature's adoption of the Punitive Damages Act. The Court observed that the Act "requires that a court reviewing an award of punitive damages be satisfied that the award is 'reasonable in its amount' and is justified in the circumstances of the case 'in light of the wrongful conduct.'" Id. at 229 (emphasis omitted) (quoting L. 1995, c. 142).

Pertinent for our purposes, Baker notes that "[a]lthough the PDA excludes LAD actions from its cap, its general requirements for procedural and substantive fairness are mandated." Ibid. "In addition," the Court observed, "there are substantive constitutional limits on the amount of punitive damages that a jury may award." Ibid. Those limits are imposed by the Due Process Clause of the Fourteenth Amendment and serve "to ensure that punitive

24

damages awards are made through a fair process that includes judicial review of awards." Ibid.

The Baker Court focused its analysis on BMW, summarizing its holding to require "that courts must examine the substantive basis of the punitive damages award to determine whether it is so excessive as to violate due process." Id. at 230. Baker recognized that the United States Supreme Court had not promulgated a bright-line rule, but instead articulated three factors for courts to consider when conducting such review:

> the degree of reprehensibility of the conduct that formed the basis of the civil suit; the disparity between the harm or potential harm suffered by the injured party who was the plaintiff in the civil case and the plaintiff's punitive damages award; and the difference between this remedy and the civil penalties authorized or imposed in comparable cases.
>
> [Ibid. (quoting BMW, 517 U.S. at 575).]

The Baker opinion noted that BMW was consistent with Justice Pollock's observation in Herman v. Sunshine Chemical Specialties, Inc., that there is "a volatile dilemma" "at the core of punitive damages" -- that the same conduct that justifies an award of such damages "can readily inflame an otherwise-dispassionate jury." Ibid. (quoting 133 N.J. 329, 337-38 (1993)). To guard against potential injustice, then, this Court in Baker warned that "the award of punitive damages must bear some reasonable relation to the injury

inflicted and the cause of the injury." Ibid. (internal quotation marks omitted)

(quoting Herman, 133 N.J. at 338). Accordingly, the Court's instructions were

as follows:

> In future LAD cases, courts reviewing punitive damages awards should apply both the requirements of the PDA (with the exception of the statutory cap) and the substantive standards of BMW v. Gore in order to ensure that any award of punitive damages bears "some reasonable relation" to the injury inflicted.
>
> [Id. at 231.]

Because the trial court had not addressed BMW's substantive standards,

the Court remanded the matter, saying that it was incumbent on the trial court

to consider the BMW factors and determine whether, thus considered, the

punitive damages award was sustainable "or whether the award reflects

prejudice, passion, or mistake warranting a new trial on the amount of punitive

damages." Ibid. We advised that the trial "court may consider, but is not

bound by, the Legislature's judgment of five times compensatory damages as a

normative measure of the limits of proportion." Ibid. But "[b]ecause some

acts of discrimination cause unquantifiable harm, the assessment of proportion

to harm may take into account whether there has been an outrageous affront to

human dignity that warrants departure from a normative punishment." Ibid.

26

C.

Since those decisions, the Court has addressed punitive damages awards involving public entity defendants in two matters of significance to this appeal: Lockley and Green, both issued on the same day.

Lockley involved an LAD claim by a male prison guard against the Department of Corrections that resulted in a jury verdict that included a $3 million award for punitive damages. 177 N.J. at 416-20. The Appellate Division reversed the award, holding that the trial court's jury instructions were "fatally flawed," in part because the State does not have the same kind of bottom-line considerations as private parties. Id. at 421-23 (quoting Lockley v. Turner, 344 N.J. Super. 1, 18-19 (App. Div. 2001), aff'd as modified, 177 N.J. 413).

We agreed with the Appellate Division and held "that in an assessment of punitive damages against a public entity the financial condition of the defendant is not useful." Id. at 430. In recognition that "public entities do not create their own wealth and are not driven by a profit motive," the Court reasoned that "consideration of the State's ability to pay does not further the goal of deterrence as it does in the private sector." Id. at 431. The Court concluded that "[t]he State cannot be deterred by an award based on its 'bottom line' because it does not have one in the private sector sense." Ibid.

27

Accordingly, Lockley instructed "that the standards applied in private sector cases, with the exception of those relating to the financial condition of the defendant, should be used to guide the jury in its computation and to assist the court in its review of a punitive damages award." Id. at 431-32. That includes "those provisions of the PDA, N.J.S.A. 2A:15-5.12(b), that set forth the standards to be used in determining whether punitive damages are warranted in the first instance"; "those standards that govern the calculation of the amount of such an award, N.J.S.A. 2A:15-5.12(c)"; and the Baker/BMW factors. Id. at 432-33.

Lockley is significant for cautioning trial courts that

> the court's responsibility to review awards of punitive damages for reasonableness is heightened when such damages are awarded against a public entity. The judge in the ordinary case acts as a check on the jury's calculation of punitive damages; in the case of a governmental entity, when public monies are the source of the award, the judge must scrutinize with great care the amount of the award to determine whether it is proportionate to the harm suffered by the plaintiff.

[Id. at 433 (emphasis added).]

Equally importantly, in <u>Lockley</u>, there was no question that the entire Court recognized the judicial debate on the availability of punitive damages against public entity defendants under the LAD to be over.[2]

The companion case to <u>Lockley</u> -- the other decision of note for purposes of this appeal -- concluded similarly.  In <u>Green</u>, the Court closed the book on the question of punitive damages against public entities in CEPA cases.  <u>See</u> 177 N.J. at 437.

The Court began in <u>Green</u> by recounting the substantive reasons for concluding that punitive damages were available under CEPA against public entity defendants.  <u>See id.</u> at 441.  The decision also relied on the doctrine of legislative acquiescence.  The Court emphasized that earlier opinions had invited the Legislature's correction if the Court was mistaken in allowing awards of punitive damages against public entities in CEPA actions.  <u>Id.</u> at 444-45.  Calculating that nine years had passed from <u>Abbamont</u> to <u>Green</u> -- and stressing the repeated "request[s] that the Legislature take up the issue" if

---

[2] <u>Lockley</u> drew a concurrence from three members of the Court, but in light of <u>Lockley</u> and its companion decision, <u>Green</u>, the concurrence recognized that "[t]he judicial debate over . . . the availability of punitive damages against public entities has come to an end," and left to the Legislature any prospect of changing course.  <u>Id.</u> at 434 (Verniero, J., concurring).

correction was needed -- the Court inferred from the Legislature's "silence that it intended to subject public entities to punitive damages under CEPA." Ibid.

Green has significance for this appeal for a second reason. Although Green involved CEPA, and this appeal involves the LAD, the Court's discussion in Green addressed a common concern: the care to be taken by the court when punitive damages are awarded against public entities.

The Court in Green drew from Lockley to emphasize "the importance of [the Lehmann] standard when considering whether an award of punitive damages is warranted in the first instance." Id. at 444. In Green's words, the Court "set rigorous standards for the calculation of punitive damages against a public entity, recognizing that 'public monies are the source of the award.'" Ibid. (quoting Lockley, 177 N.J. at 432-33). That said, the Court reposed its trust in the trial courts, which must review punitive damages awarded by juries before approving them, and exhorted the courts to "be vigilant in their review of such awards." Ibid.

The concurring Justices in Lockley dissented in Green. The dissent asserted that the PDA did not provide adequate safeguards because "the Legislature did not contemplate the use of the PDA for punitive damage awards against public entities." Id. at 449-50 (Verniero, J., dissenting). The dissent voiced concern that "taking away an additional limitation on the size of

punitive damage awards [to wit, the State's ability to pay,] places public entities at risk of being treated more harshly than private sector entities, or even individuals." Id. at 450. That "absence . . . may lead a jury naturally to assume that a public entity has the wherewithal through its power of taxation to pay almost any award." Ibid.

In the dissent's view, "[t]he problem with punitive damages against public entities is that it is unworkable"; because the upper management of the defendant do not themselves pay the award, the dissent reasoned, upper management is "unlikely to be deterred by the threat of a punitive damages award." Ibid. However, the dissent concluded with the observation that the Legislature's "silence or action" on the availability of punitive damages "will be conclusive on the issue." Id. at 451.[3]

## D.

There can be no doubt that punitive damages awards under the LAD are available against public sector defendants. Cavuoti so held and Lockley elaborated on that point, giving direction on fine points of implementation, in

---

[3] See 177 N.J. at 449 (Verniero, J., dissenting) (commenting nonetheless that "allowing punitive damages against a public entity is so far contrary to the interests of the public, we would have expected the Legislature to speak clearly and unambiguously if it intended such a declaration against the people's self-interest," reiterating what Justice Pollock first said in his separate opinion in Abbamont).

31

recognition that "public monies are the source of the award."  177 N.J. at 432-33.  Green added to the Court's emphasis that the debate was over, at least in judicial forums.

We recognize the continuing vitality of Lockley and its formulation of the law to the present day, as well as that of all the cases that led up to it and compelled its result.  Lockley has stood for almost twenty years, and the Legislature has not seen fit to overturn, or fine tune, its holding and guidance.  And, almost twenty-two years have now passed since Cavuoti first resolved the punitive damages issue in an LAD case.

The Legislature's inaction bespeaks acquiescence and provides a continuing message of legislative intent to subject public entities to punitive damages under the LAD.  Further debate over that policy belongs in the legislative arena.

IV.

The chief complaint by the State to the Appellate Division's remand instructions goes to the appellate court's lack of attention to the heightened standard of scrutiny imposed by Lockley on trial courts reviewing a jury's punitive damages award.  Pritchett and the amici supportive of her position assert that there is no heightened standard and that the Court's discussion in Lockley was meant to require courts to ensure that public entity defendants are

32

not worse off because the ability-to-pay considerations identified in the PDA were held not to apply to public sector defendants. The State has the better of the argument.

Although the PDA does not establish the right to punitive damages, N.J.S.A. 2A:15-5.15, the Act, generally, governs how punitive damages may be awarded, id. at -5.12; sets a generally applicable cap on the size of the award, id. at -5.14(b); and carves out exceptions to the cap, including "causes of action brought pursuant to" the LAD, id. at -5.14(c).[4]

The PDA envisions an active role for the trial court in reviewing the jury's determinations, calling upon the court, "[b]efore entering judgment for an award of punitive damages," to "ascertain that the award is reasonable in its amount and justified in the circumstances of the case, in light of the purpose to punish the defendant and to deter that defendant from repeating such conduct." Id. at -5.14(a). The same subsection further empowers the court to exercise the power of remittitur or to "eliminate the award of punitive damages" if the court determines that either is "necessary to satisfy the requirements of this section." Ibid.

---

[4] See also Tarr v. Bob Ciasulli's Mack Auto Mall, Inc., 390 N.J. Super. 557, 567 (App. Div. 2007) ("The Legislature's purpose in enacting the Act was to establish more restrictive standards with regard to the awarding of punitive damages." (quoting Pavlova v. Mint Mgmt. Corp., 375 N.J. Super. 397, 403 (App. Div. 2005))), aff'd, 194 N.J. 212 (2008).

With respect to punitive damages assessed by a jury against a public entity defendant, this Court imposed a unique and special duty.  In addition to the PDA's requirement that the trial court be satisfied that the amount calculated by the jury is reasonable, the court must adhere to <u>Lockley</u>'s instruction that the reasonableness assessment be subjected to heightened scrutiny when punitive damages are awarded against a public entity.  <u>Lockley</u>, 177 N.J. at 433; <u>see also</u> <u>Green</u>, 177 N.J. at 444.  Indeed, in <u>Lockley</u>, we emphasized the heightened standard's role when considering whether a punitive award is warranted in the first instance.

The Court saw a need for that role due to its holding that certain PDA factors, which ordinarily would inform the jury about a defendant's ability to pay a punitive damages award, and might have a constraining effect on the amount of the award imposed by the jury, would not be presented in the case of a public entity defendant.  <u>See</u> <u>Lockley</u>, 177 N.J. at 430-33.  But the heightened standard's role is not, as amici contend, only to ensure that public entities are not treated worse than private entity defendants -- that is a crabbed interpretation of the Court's discussion about the direction for heightened scrutiny.  The context in which the Court made that statement was its recognition that public funds were at stake, and the Court imposed a special responsibility on the trial court to review for reasonableness an award of

34

publicly funded monies for punitive purposes. Id. at 433. Green's discussion reinforces that message contained in Lockley. Green, 177 N.J. at 444. The majority opinions in Lockley and Green were responsive to concerns of the separately writing Justices; and, with due knowledge that certain PDA factors were being eliminated, the Court insisted that the trial judge perform a heightened review role.

The Appellate Division's instructions, which were thoughtfully considered and largely correct, were mistaken in this specific respect. The court did not mention the heightened review role to be played by the trial court and referred only to the Baker and BMW considerations. That significant omission requires correction because the Baker and BMW factors are related to due process considerations, Baker, 161 N.J. at 229-30, and are not a substitute for Lockley's direction for heightened trial-court review when public entities are on the giving end of a punitive damages award by a jury.

Lockley instructs that the trial court's review is not merely to ensure that a punitive damages award comports with due process. See 177 N.J. at 432-33. There is an extra review role, one beyond keeping the award to the amount necessary to avoid transgressing due process. By that, we do not mean additional steps to the existing analytic framework, but rather a more rigorous application of what is already in place as factors to be considered when

35

assessing the punitive damages award in the context of the factual circumstances of the wrong involved and the nature of the public entity defendant.[5] To the extent that the Baker/BMW factors assist in that assessment and add to those mentioned, and applicable, under the PDA, we agree with counsel for the State that the factors overlap. These are not independent assessments; rather, they coalesce for a holistic assessment. See Lockley, 177 N.J. at 433.

In sum, we instruct the trial court on remand, and all trial courts reviewing a punitive damages award issued by a jury against a public entity defendant, to review the award under the heightened scrutiny required in Lockley and explicated in Green.

---

[5] We do not suggest that the judge's review should entail additional information beyond that which is presented to the jury, with its restrictions against inclusion of information about the public entity's finances. See Lockley, 177 N.J. at 430-32. We do not retreat from the judgment expressed in Lockley that presentation of the financial picture of a public entity is fraught with difficulty and should not be presented to the jury or through any expansion of information presented to the trial court reviewing a jury's punitive damages award. Ibid. That said, although the State did not appeal the jury instructions used in this matter, at argument the prospect of review of the model jury charge on the award of punitive damages against a public entity defendant was raised. We invite that review, if only for the purpose of adding a sentence that simply but explicitly states that the jury should not forget that an award of punitive damages comes from public funds.

36

We turn next to review the remand instructions, which were criticized by the State as inconsistent with our jurisprudence in this area.

V.

We begin with the observation that, in large part, we find the Appellate Division's discussion of the Baker/BMW factors to be substantially correct.

As those cases explain, the Due Process Clause of the Fourteenth Amendment imposes outer limits on the allowable size of an award of punitive damages. Baker, 161 N.J. at 229-30 (quoting and discussing BMW). We commend the Appellate Division for instructing the trial court, on remand, to substantially consider the factors advanced in BMW and incorporated into New Jersey law by Baker. The Appellate Division correctly highlighted BMW and State Farm as twin guiding lights lit by the United States Supreme Court in this otherwise hazy area, where courts are tasked with reviewing a punitive damages award.

We commend the Appellate Division's identification of the three factors explicated in BMW: "the degree of reprehensibility of the [underlying tort]; the disparity between the harm or potential harm suffered by [Pritchett] and [her] punitive damages award; and the difference between this remedy and the civil penalties authorized or imposed in comparable cases." 517 U.S. at 575. In doing so, we emphasize that the first consideration is "[p]erhaps the most

important" and that the mental state or track record of the defendants speaks to the reprehensibility of the conduct, id. at 575-77.

Although the United States Supreme Court in BMW introduced the consideration of ratios between compensatory and punitive damages in the discussion of the second factor, see id. at 580-82, the Court cautioned in that case and in State Farm that mathematical formulae alone cannot encapsulate the multiple facets of the Due Process Clause or address all of its concerns, BMW 517 U.S. at 582 ("[W]e have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual and potential damages to the punitive award." (emphasis omitted)); State Farm, 538 U.S. at 424 ("[W]e have been reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award."); accord Exxon Shipping Co. v. Baker, 554 U.S. 471, 501 (2008) (restating the principle in dicta).

Thus, "because there are no rigid benchmarks that a punitive damages award may not surpass," "courts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." State Farm, 538 U.S. at 425-26. Indeed, the Supreme Court has intimated that there might be awards that "exceed[] a

single-digit ratio between punitive and compensatory damages, to a significant degree, [that] will [still] satisfy due process." Id. at 425.

We therefore further approve of how the Appellate Division highlighted State Farm's point that this analysis entails more than the rote application of bright-line ratios. Although mathematical expressions can give useful perspective, simple resort to a calculator cannot and must not supplant the well-considered judgment of our trial courts. Ibid. ("While these ratios are not binding, they are instructive.").

Finally, we point out that the Legislature, in the LAD setting, is similarly reluctant to rely solely on bright-line ratios, exempting the LAD in N.J.S.A. 2A:15-5.14(c) from the PDA's cap on punitive damages provided in -5.14(b). Those authorities, then, serve to convince that sole reliance on such ratios and caps is impermissible and that a holistic assessment of the Baker/BMW factors is always required. See Baker, 161 N.J. at 231.[6]

In sum, we find no error in the guidance that the Appellate Division provided to the trial court when remanding this matter, other than the omission

---

[6] That is not to say, however, that there are no numerical examples to guide the trial court's review. BMW's third factor instructs courts to consider "the civil penalties authorized or imposed in comparable cases." 517 U.S. at 575. Lockley instructed trial courts to look to the LAD's schedule of civil penalties as further grounding, but not controlling, the court's analysis. 177 N.J. at 432 (citing N.J.S.A. 10:5-14.1a).

39

of heightened scrutiny previously addressed.  That omission compels our modification of the appellate judgment.  <u>See</u> <u>supra</u> Section IV.  The heightened scrutiny that this Court decreed in the review of a jury's award of punitive damages against a public sector defendant is essential to our direction on how to assess the availability of punitive damages against such defendants.

## VI.

The judgment of the Appellate Division is affirmed as modified.


CHIEF JUSTICE RABNER and JUSTICES ALBIN, PATTERSON, FERNANDEZ-VINA, SOLOMON, and PIERRE-LOUIS join in JUSTICE LaVECCHIA's opinion.